Opinion
WERDEGAR, J.
Defendant Tuan Van Nguyen was convicted in 1997 of violating Penal Code[1] section 209, subdivision (b), kidnapping for the purpose of robbery, otherwise known as aggravated kidnapping. We granted review and limited the issue on review to “whether the risk of harm required to elevate kidnapping to aggravated kidnapping may be a risk of psychological harm.” (Italics added.) As explained below, we conclude the answer to this question is that it may.
Facts
Julie Overacker rented a room in Thomas Savoca’s house in San Jose. As she was unpacking her boxes, Tuan Van Nguyen (defendant) and Binh Nguyen (Binh) walked in. Binh pointed a gun at Savoca’s head and ordered Overacker and S avoca to lie on the floor. Defendant ripped the telephone cord from the wall and used it to bind Savoca. Binh pointed the gun at Overacker and demanded money and jewelry. She complied. Not satisfied, Binh demanded more, pointing the gun at Overacker’s temple. Overacker replied they could take anything in the house. She was led downstairs at gunpoint, at which time she noticed two additional men in the house. Three of the robbers went upstairs while Binh remained to guard Overacker. Overacker heard the three men looking through her belongings. Binh ordered her to close the blinds and turn off the lights. She complied. Binh then led *875 Overacker back upstairs and placed her in a closet, while the robbers continued to rummage through the house. Binh announced the robbers would remove her from the house because she did not have anything they wanted. She offered her credit card. Binh declined, but asked whether she had an automatic teller machine (ATM) card. She said she did and was told to retrieve it. Binh also retrieved Savoca’s ATM card, and both victims were made to reveal their personal identification numbers. The robbers then decided to leave Savoca tied up and take Overacker with them to a bank to use the ATM cards.
At this point the robbers had been in the house about 45 minutes. Binh, accompanied by defendant, led Overacker out of the house at gunpoint. She could see men carrying things out of the house and loading them into a car. Binh, defendant and Overacker got into Overacker’s green Honda Accord, and the other two robbers followed in a brown hatchback. Once at the bank, Binh ordered Overacker to withdraw “all” her money. She withdrew $200 from the ATM, explaining to her assailants that withdrawals were limited to a daily maximum of $200. They returned to the house.
In the meantime, Savoca managed to free himself. He ran towards a neighbor’s home, but hid when he saw Overacker’s car return. When the robbers discovered Savoca was gone, they engaged in much shouting and quickly drove off, with Overacker still in the car. Binh told Overacker, “your boyfriend got away, he’s very stupid, we told him we’d kill you.”
Binh told Overacker to lie under the dashboard of the car and not look up and try to identify him or he would have her killed. She offered that Savoca had probably called the police so they should just let her go. Defendant initiated an animated discussion with his companions, apparently in Vietnamese, which Overacker took to mean he disagreed with her suggestion. They transferred their stolen goods from Overacker’s car to the brown hatchback. Rather than release Overacker, however, the kidnappers forced her to the rear floor of the brown car while one of the robbers covered her eyes with his hands. They went to a convenience store, where the kidnappers engaged in another animated discussion. They eventually gave Overacker some juice and told her to drink it and go to sleep. Fearing the juice was drugged, Overacker pretended to drink and then feigned sleep.
The robbers then drove to a remote wooded area and told Overacker to wake up. Overacker believed they would kill her there. Instead, after another conversation among themselves, the kidnappers told her they would wait until after midnight so they could use the ATM cards again, whereupon they would release her. After midnight, they drove in Overacker’s green Honda *876 Accord to a different bank, where Binh attempted to use the stolen ATM cards. San Jose Police Officer Tomlin observed the green Honda, obtained confirmation that it belonged to Overacker, and radioed for assistance while he followed the car. When he identified himself, two kidnappers exited the car and ran in opposite directions.
Because the initial report involved four kidnappers and the green Honda had tinted windows that prevented Officer Tomlin from seeing inside the car, he waited about 45 seconds to ensure no more people would emerge from the car. Satisfied, he approached the car and found it empty except for Overacker, who was lying in a fetal position on the floor. She was “[v]ery distraught . . . crying, shaken.” Officer Tomlin testified he “could hardly get her out of the car.” He estimated it took “up to two minutes” to coax Overacker from the car.
Defendant was charged, among other felonies, with violating section 209, subdivision (b), kidnapping Overacker for purposes of robbery. In closing argument, the prosecutor spoke to the nature of the compelled movement of the victim: “Where [the movement] becomes more than slight, brief or trivial is where they take her out of her own house on Palm Sunday, put her in her car, and drive her down to [the bank] to go rob her. [¶] I would submit to you, ladies and gentlemen, that at that point you have got enough movement at about the time they are out of that house, getting close to the car. The rest is just icing on the cake in that regard. [¶] The movement substantially increased the risk of harm to the person moved over and above that necessarily present in the robbery itself. And that means that you rob a person in their house. Obviously they are in danger. But when you take a person out of their house at gunpoint, you can see by the facts we saw here what can happen. They drove her around for close to two hours. They took her up in the foothills, in the woods someplace. [¶] Does that increase the risk of injury? Of course it does. The risk of harm? Ask Julie Overacker where she comes to that. That’s pretty simple and pretty straightforward. Again, movement in the house, I would submit to you that that’s incidental to the robbery itself. Once you get out of that front door with the intent to go to the ATM, we have kidnap for robbery.”
Regarding the aggravated kidnapping charge, the trial court delivered the following instruction: “Kidnapping is the unlawful movement by physical force of a person without that person’s consent for a substantial distance where the movement is not merely incidental to the commission of the robbery and where the movement substantially increases the risk of harm to the person moved, over and above that necessarily present in the crime of robbery itself [¶] Kidnapping is also the unlawful compulsion of another *877 person without that person’s consent and because of a reasonable apprehension of harm, to move for a substantial distance where such movement is not merely incidental to the commission of the robbery and where the movement substantially increases the risk of harm to the person moved, over and above that necessarily present in the crime of robbery itself. [¶] Brief movements to facilitate the crime of robbery are incidental to the commission of the robbery. [¶] On the other hand, movements to facilitate the robbery that are for a substantial distance ... are not incidental to the commission of the robbery. [¶] In order to prove this crime, each of the following elements must be proved: [¶] . . . [¶] 5. The movement substantially increased the risk of harm to the person moved, over and above that necessarily present in the crime of robbery itself.” (Italics added.)
After it had retired to deliberate, the jury sent out a question, asking whether the “harm” referred to in the phrase “The movement substantially increased the risk of harm to the person moved” could include “psychological harm.” The trial court gave this reply: “Webster’s defines harm as physical or mental damage.” The jury found petitioner guilty of aggravated kidnapping as well as the other charged felonies.
Discussion
In light of the jury’s question about psychological harm and the trial court’s response, defendant contends the jury may have relied on his infliction of such nonphysical injury to convict him of aggravated kidnapping. Because he contends section 209 is limited to forced movements of the victim that substantially increase the risk of bodily or physical harm only, he argues we must reverse his conviction for aggravated kidnapping.
In 1995, at the time defendant committed his crime, section 209, subdivision (b) provided: “Any person who kidnaps or carries away any individual to commit robbery shall be punished by imprisonment in the state prison for life with possibility of parole.” (Stats. 1990, ch. 55, § 3, p. 394.) Although the statute at that time had no express requirement that movement of the victim substantially increase the risk of harm to the victim, we held in 1969 that implicit in the history of section 209 was a requirement that—in order to constitute an aggravated kidnapping—the movement (or asportation) of the victim (1) could not be incidental to the robbery, and (2) must “substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself.” (People v. Daniels (1969) 71 Cal.2d 1119, 1139 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677] (Daniels); see generally People v. Rayford (1994) 9 Cal.4th 1, 14-19 [36 Cal.Rptr.2d 317, 884 P.2d 1369] [recounting the history of the Daniels rule].)
*878 In 1997, the Legislature made this implicit requirement explicit, so that section 209, subdivision (b) now provides: “(1) Any person who kidnaps or carries away any individual to commit robbery [or other enumerated crimes] shall be punished by imprisonment in the state prison for life with possibility of parole, [¶] (2) This subdivision shall only apply if the movement of the victim is beyond that merely incidental to the commission of and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense.” (§ 209, as amended by Stats. 1997, ch. 817, § 2, italics added.)
The first step in our analysis is to examine the actual words of the statute, giving to them a commonsense meaning. (California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist. (1997) 14 Cal.4th 627, 633 [59 Cal.Rptr.2d 671, 927 P.2d 1175]; Mercer v. Department of Motor Vehicles (1991) 53 Cal.3d 753, 763 [280 Cal.Rptr. 745, 809 P.2d 404].) As indicated, however, in 1995, at the time defendant committed his crime, section 209, subdivision (b) did not expressly require any type of harm. Considering the 1995 version of section 209, subdivision (b) together with Daniels, supra, 71 Cal.2d 1119, is no more illuminating, for although Daniels interpreted the statute to require an increased risk of harm, it did not distinguish for that purpose between bodily and psychological harm. Nor did the 1997 amendment to section 209 clarify matters: the Legislature adopted and codified the Daniels rule, but the amended statute does not indicate on its face whether the harm required for an aggravated kidnapping embraces psychological harm or whether only physical or bodily harm will suffice.
lust as the actual words of the statute do not resolve this problem, an examination of post-Daniels case law is similarly unhelpful. Defendant relies on People v. Timmons (1971) 4 Cal.3d 411 [93 Cal.Rptr. 736, 482 P.2d 648] (Timmons). In Timmons, we addressed whether a substantial increase in the risk of harm to the victims occurred when the defendants forced them to drive five blocks to effectuate their robbery. We concluded “this brief asportation may conceivably have increased the risk in some slight degree beyond that inherent in the commission of the robberies, but it cannot be said to have ‘substantially’ increased that risk.” (Id. at p. 416, fn. omitted.) In reaching this conclusion, we described the rule in Daniels, supra, 71 Cal.2d 1119, stating that when Daniels referred to a movement that “ ‘substantially increase^] the risk of harm,’ ” “we intended to refer to an increase in the risk that the victim may suffer significant physical injuries over and above those to which a victim of the underlying crime is normally exposed.” (Timmons, supra, at p. 414, italics added.) Subsequent opinions also spoke in terms of physical harm. (See, e.g., In re Earley (1975) 14 Cal.3d 122, 128, fn. 7 [120 Cal.Rptr. 881, 534 P.2d 721]; People v. Stanworth (1974) 11 Cal.3d 588, 598 *879 [114 Cal.Rptr. 250, 522 P.2d 1058], overruled on another ground in People v. Martinez (1999) 20 Cal.4th 225, 237 [83 Cal.Rptr.2d 533, 973 P.2d 512]; People v. Milan (1973) 9 Cal.3d 185, 192-193 [107 Cal.Rptr. 68, 507 P.2d 956].) Defendant thus urges that Timmons suggests the risk to which Daniels refers is limited to a risk of physical injury.
By contrast, the People rely on People v. Laursen (1972) 8 Cal.3d 192 [104 Cal.Rptr. 425, 501 P.2d 1145] (Laursen). In that case, defendant Laursen and a companion committed an armed robbery and then fled the scene. When their getaway car failed to start, the robbers commandeered a car driven by Teeter, forcing him to drive them to a place of safety. Upon Laursen’s conviction of kidnapping for robbery, he claimed on appeal that Teeter’s kidnap, committed while Laursen had attempted to escape from the site of the robbery, did not come within the terms of the aggravated kidnapping statute because his intent to kidnap Teeter arose after the robbery had already begun. In rejecting that contention, we described the rule of Daniels, supra, 71 Cal.2d 1119, noting, “the primary purpose of [section 209] is to impose harsher criminal sanctions to deter the carrying away of persons during the commission of a robbery in a manner which substantially increases the risk that someone will suffer grave bodily or psychic injury or even death.” (Laursen, supra, at p. 198, italics added.) The People thus assert Laursen recognizes that the risk to which Daniels refers can include a risk of psychological injury.
Neither Timmons, supra, 4 Cal.3d 411, nor Laursen, supra, 8 Cal.3d 192, addressed the precise question of whether a substantially increased risk of psychological injury, in the absence of a similarly increased risk of physical injury, can satisfy the Daniels test. Accordingly, any comment the cases made concerning the type of harm required by Daniels was unnecessary to their respective decisions and, thus, dicta. (Mercury Ins. Group v. Superior Court (1998) 19 Cal.4th 332, 348 [79 Cal.Rptr.2d 308, 965 P.2d 1178] [“A decision, of course, is not authority for what it does not consider”]; In re Marriage of Cornejo (1996) 13 Cal.4th 381, 388 [53 Cal.Rptr.2d 81, 916 P.2d 476] [“ ‘It is axiomatic that cases are not authority for propositions not considered.’ (People v. Gilbert (1969) 1 Cal.3d 475, 482, fn. 7 [82 Cal.Rptr. 724, 462 P.2d 580].)” (Fn. omitted.)].)[2]
To our knowledge, the question of psychological versus physical harm occurring in the context of aggravated kidnapping has specifically been *880 addressed only once, still only in dictum. This was in the Court of Appeal’s decision in the infamous Chowchilla kidnapping case. (People v. Schoenfeld (1980) 111 Cal.App.3d 671 [168 Cal.Rptr. 762] (Schoenfeld).) In that case, the three defendants confined the kidnapped bus driver and children in a van buried in a quarry. A hole had been cut in the roof of the van to allow ingress and egress, and holes had been cut in the fenders to serve as rudimentary toilets. Battery-powered fans supplied air through flexible hoses connected to four-inch holes cut into the walls of the van. Water and some food were provided. The kidnappers told the children they would stay in their underground prison for 24 to 48 hours. After all the victims had been lowered into the van, a steel plate was placed over the roof opening and weights were placed on it. Fortunately, through the heroic efforts of the bus driver and some of the older children, all the victims escaped with only minor physical injuries.
The defendants in Schoenfeld were charged with 27 counts of kidnapping for ransom and with five counts alleging the victims therein suffered “bodily harm.” (Schoenfeld, supra, 111 Cal.App.3d at p. 675; former § 209; see now § 209, subd. (a).) They pleaded guilty to kidnapping, but reserved the right to contest the disputed allegations of bodily harm in a bifurcated hearing before the court. After the hearing, the trial court found that three of the victims had suffered bodily harm; accordingly, the court sentenced the defendants to life in prison without possibility of parole on those three counts. On appeal, the Court of Appeal struck the findings of bodily harm and the related determination of parole ineligibility but otherwise affirmed.
In rejecting the trial court’s determination of bodily injury, the Court of Appeal observed that, while every kidnapping for purposes of ransom necessarily involves some form of physical restraint, “it is the introduction of substantial bodily harm or injury—not the physical restraint—which triggers the augmented penalty.” (Schoenfeld, supra, 111 Cal.App.3d at p. 687.) The court noted the evidence showed the victims suffered only minor physical ailments, such as scrapes, nosebleeds and stomachaches. None of these “transient physical distresses,” the court concluded, “amounted to serious or substantial bodily injuries.” (Ibid.)
Addressing the trial court’s stated view that the total experience “constituted ‘an ordeal of terror, . . . [which] . . . causes suffering .... And suffering to me is what this statute is all about’ ” (Schoenfeld, supra, 111 Cal.App.3d at p. 680), the Court of Appeal stated: “No rational person could doubt that the combined effect of such difficult and trying circumstances, *881 together with the level of fear generated during the long hours of dark confinement, would cause all of the imprisoned victims—especially the youngest—to undergo great mental suffering or emotional harm implied in the findings below. But as the cases which have grappled with the amorphous concept of ‘bodily harm’ in a variety of factual contexts teach[], something more than emotional trauma or mental or psychological harm, typically associated with all forms of involuntary restraint and confinement, is required in order to justify the harsher mandatory penalty ....
“Though it is debatable that no meaningful distinction exists in human terms between trauma-inflicted pain and suffering as opposed to fright-induced mental anxiety and emotional distress, the latter is not the functional equivalent of a substantial bodily injury due to the application of a physical force beyond that necessarily involved in the forcible restraint itself. The trial court compounded its error in mechanically equating the statutory objective with any level or kind of ‘suffering.’ But as discussed herein, it appears eminently more reasonable to conclude that all kidnapings involve some degree of suffering insofar as mental distress or emotional harm is relatively manifested. If, as the People contend, such evidence alone (with or without minor physical symptoms) is sufficient, then conceptually every forcible restraint and confinement would be automatically subject to the augmented penalty without the essential showing of substantial bodily injury. Such an unreasonable result would totally defeat the dual purpose of preventing physical harm to the victim and providing an added penalty for the more abhorrent criminal conduct. (People v. Jackson [(1955)] 44 Cal.2d [511,] 517 [282 P.2d 898].)” (Schoenfeld, supra, 111 Cal.App.3d at pp. 687-688, italics in original, underscoring added, fns. omitted.)[3]
As may be seen, Schoenfeld is inapposite. Whereas in Schoenfeld the court was concerned with the express statutory requirement that, to render a defendant convicted of kidnapping for ransom ineligible for parole, the victim must have suffered serious “bodily harm” (Schoenfeld, supra, 111 Cal.App.3d at pp. 682, 685), here we are dealing with the requirement that, for a kidnapping for robbery to qualify as an aggravated kidnapping, the asportation of the victim must substantially increase the “risk of harm” to the victim (Daniels, supra, 71 Cal.2d at p. 1139). That the injuries to the victims in Schoenfeld did not qualify as “bodily harm” for purposes of the increased penalty has no bearing on whether the asportation of the victims increased *882 their “risk of harm.” Indeed, one could readily conclude the victims did suffer such increased risk of harm, both mental and physical (including, e.g., dehydration, starvation, suffocation, a cave-in, or physical injuries suffered while trying to escape). (See generally People v. Rayford, supra, 9 Cal.4th at p. 13.) Accordingly, Schoenfeld is not authority for concluding the risk of harm requirement of section 209, subdivision (b) is limited to movement increasing the risk only of physical harm.
Just as an examination of precedent provides no definitive answer, scrutiny of the legislative evolution of section 209 does not reveal whether a risk of psychological harm is encompassed within the Daniels rule. Section 207, originally enacted in 1872, delineated what is today called “simple kidnapping” and merely restated the common law, which required that the victim be moved across county or state lines. (People v. Wein (1958) 50 Cal.2d 383, 414 [326 P.2d 457] (dis. opn. of Carter, J.), overruled in part by Daniels, supra, 71 Cal.2d 1119; People v. Ordonez (1991) 226 Cal.App.3d 1207, 1225 [277 Cal.Rptr. 382] (Ordonez).) The first aggravated kidnapping statute, section 209, was enacted in 1901; it provided that one who “maliciously, forcibly, or fraudulently takes or entices away any person with intent to restrain such person and thereby to commit extortion or robbery, or exact from the relatives or friends of such person any money or valuable thing, is guilty of a felony, and shall be punished therefor by imprisonment in the state’s prison for life, or any number of years not less than ten.” (Stats. 1901, ch. 83, § 1, p. 98; quoted in People v. Knowles (1950) 35 Cal.2d 175, 194 [217 P.2d 1] (dis. opn. of Edmonds, J.).) At that early time, the offense included no requirement that the individual kidnapped for robbery be harmed or endure the risk or threat of harm.
In the wake of the nation’s heightened concern over kidnappings for ransom occasioned by the infamous abduction of the Lindbergh baby, this state in 1933 followed the enactment of the Federal Kidnaping Act (the so-called Lindbergh Law, 18 U.S.C. § 1201)[4] with an amendment to section 209. Twice amended in 1933, section 209 eventually read: “Every person *883 who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever with intent to hold or detain, or who holds or detains, such individual for ransom, reward or to commit extortion or robbery or to exact from relatives or friends of such person any money or valuable thing, or who aids or abets any such act, is guilty of a felony and upon conviction thereof shall suffer death or shall be punished by imprisonment in the State prison for life without possibility of parole, at the discretion of the jury trying the same, in cases in which the person or persons subjected to such kidnaping suffers or suffer bodily harm or shall be punished by imprisonment in the State prison for life with possibility of parole in cases where such person or persons do not suffer bodily harm.” (Stats. 1933, ch. 1025, § 1, pp. 2617-2618, italics added.)
As explained in Ordonez, supra, 226 Cal.App.3d at page 1226: “The 1933 amendment omitted [as a requirement] the element of asportation which the Lindbergh Law had included, and it increased the penalty to death or life imprisonment without the possibility of parole if the victim suffered bodily harm. Thus, California law, like the federal law, tied the severity of the penalty to the harm suffered by the victim. ‘Both the federal and California Supreme Courts recognized the augmented penalty’s purpose to deter the kidnaper from harming his victim, to induce him to release the victim unharmed.’ (In re Maston (1973) 33 Cal.App.3d 559, 563 [109 Cal.Rptr. 164], citing Robinson v. United States (1945) 324 U.S. 282, 284 [89 L.Ed. 944, 946, 65 S.Ct. 666]; People v. Jackson[, supra,] 44 Cal.2d 511, 517 . . . .)” (See also People v. Knowles, supra, 35 Cal.2d at p. 180 [discussing abandonment of the asportation requirement].)
In short, the 1933 amendment to section 209 changed the crime of aggravated kidnapping to include, for the first time, the concept of harm to the victim, linking that concept to the severity of the penalty. In so doing, the amendment spoke specifically of “bodily harm.” (Stats. 1933, ch. 1025, § 1, p. 2618.)
Section 209 was amended again in 1951 to reintroduce asportation as a requirement for kidnapping for robbery. (Stats. 1951, ch. 1749, § 1, p. 4167.) *884 The Legislature, however, retained the previous statutory language making “bodily harm” a prerequisite for the death penalty (or life imprisonment without possibility of parole): (Ibid.)[5]
In 1973, the Legislature again amended section 209, this time providing for a mandatory death penalty in the event the victim died during an aggravated kidnapping. (Stats. 1973, ch. 719, § 8, p. 1300; see generally Ordonez, supra, 226 Cal.App.3d at p. 1226 & fn. 10.) As before, the Legislature retained the mandatory higher penalty of life imprisonment without parole in cases where the victim suffers “bodily harm.” (Stats. 1973, ch. 719, § 8, p. 1300.) (The Legislature subsequently abolished the mandatory death penalty for aggravated kidnapping resulting in death [Stats. 1977, ch. 316, § 15, p. 1262], instead making the death penalty merely permissive under those circumstances [former § 190.2, subd. (c)(3)(ii); see Stats. 1977, ch. 316, § 9, pp. 1257-1258].)
In 1976, as part of the reorganization and rewriting of penal statutes that resulted from the enactment of the Uniform Determinate Sentencing Act (Stats. 1976, ch. 1139, § 350, p. 5175), section 209 was reconfigured, segregating the crime of kidnapping for ransom, extortion or reward into subdivision (a) of the section and that of kidnapping for robbery into subdivision (b). (Stats. 1976, ch. 1139, § 136.5, p. 5099.) This division of crimes made sense because kidnapping for ransom, extortion or reward does not require the kidnappers forcibly to move the victim, whereas since the 1951 amendment to the statute, kidnapping for robbery has required such movement. (People v. Rayford, supra, 9 Cal.4th at p. 12, fn. 8; Ordonez, supra, 226 Cal.App.3d at pp. 1226-1227.)
For the section 209, subdivision (a) crimes (kidnapping for ransom, extortion or reward), the statutory language linking “bodily harm” with the *885 higher penalty of life imprisonment without possibility of parole was retained. The new subdivision (b) of section 209, by contrast, made no reference to bodily harm, nor did it retain the increased penalty of life imprisonment without the possibility of parole. That subdivision merely stated: “Any person who kidnaps or carries away any individual to commit robbery shall be punished by imprisonment in the state prison for life with possibility of parole.” (Stats. 1976, ch. 1139, § 136.5, p. 5099.) In other words, by its terms the statute did not carry over to the crime of kidnapping for robbery, now set forth in new section 209, subdivision (b), a linkage of “bodily harm” with an increased penalty.
The Legislature’s failure, in new section 209, subdivision (b), to retain the concept of “bodily harm” in connection with the required asportation seems deliberate. In separating out kidnapping for robbery from kidnapping for ransom or extortion, the Legislature also eliminated any possibility of a sentence of life without parole for the former crime. Consequently, no justification appears for retaining, in the definition of “harm” for asportation, the requirement of section 209, subdivision (a) that only bodily harm would suffice. That is, that the Legislature has long provided greater punishment for aggravated kidnappers (or at least some aggravated kidnappers) who cause bodily harm to their victims does not necessarily mean the Legislature also intended to confine the asportation element of kidnapping for robbery to cases where the forced movement has increased the risk of physical injury, and to render irrelevant an increased risk of mental, emotional or psychological harm.
Rather, the more plausible conclusion is that when it separately criminalized the act of kidnapping to commit robbery, the Legislature intended to target coerced movement resulting in an increased risk either of grave physical injury or of mental terror. This conclusion is consistent with Daniels, supra, 71 Cal.2d 1119. Although the Daniels court was concerned with the asportation element of kidnapping, it first discussed the element of bodily harm, proof of which was required for an enhanced penalty. In discussing the meaning of “bodily harm” for purposes of enhanced punishment, the court quoted People v. Tanner (1935) 3 Cal.2d 279, 297 [44 P.2d 324] to the effect that “bodily” pertains to the body: “ ‘It is opposed to mental,’ ” whereas “harm” “ ‘is defined as “hurt; injury; damage; (2) grief, pain, sorrow . . . (Daniels, supra, at p. 1132.) Although the Daniels court noted that in People v. Jackson, supra, 44 Cal.2d 511, we modified Tanner to require substantial bodily harm for purposes of an enhanced penalty (Daniels, supra, at p. 1133), neither Jackson nor Daniels rejected the Tanner court’s understanding of the meaning of “harm.”
Having thus expressly recognized that the word “harm,” standing alone, could include mental suffering, the Daniels court, in requiring a substantially *886 increased risk of harm for the asportation element of kidnapping for the purpose of robbery, logically must have intended that requirement to be satisfied by a substantially increased risk of either physical or mental harm. Viewed in this light, substantial movement of a victim, by force or fear, which poses a substantial increase in the risk of psychological trauma to the victim beyond that to be expected from a stationary robbery, seems an entirely legitimate basis for finding a separate offense. To conclude the word “harm,” as used in section 209, subdivision (b), includes psychological harm is thus reasonable.[6]
 Accordingly, the Court of Appeal did not err in affirming defendant’s conviction of kidnapping for robbery.[7]
Conclusion
The decision of the Court of Appeal is affirmed.
George, C. J., Kennard, J., and Baxter, J., concurred.

Unless otherwise indicated, all further statutory references are to the Penal Code.

We disagree with the assertion in Justice Chin’s concurring and dissenting opinion that decisions decided after Daniels “demonstrate that under Daniels, a substantially increased risk of physical harm is necessary to sustain defendant’s section 209 conviction, and that a substantially increased risk of only psychological harm is insufficient.” (Conc. & dis. opn. of Chin, J., post, at pp. 891-892, italics added.) Inasmuch as the question of physical versus psychological harm was not posed in any of the cases cited, none “demonstrate” that a substantially increased risk of psychological harm would be insufficient. At most, the cases *880 hold that a substantially increased risk of physical harm would be sufficient to support a conviction under section 209.

In response to the Schoenfeld decision, the Legislature added a provision to section 209 mandating a life sentence without possibility of parole for kidnappers who intentionally confine a victim “in a manner which exposes such person to a substantial likelihood of death.” (Stats. 1982, ch. 4, § 1, p. 4; see Review of Selected 1982 California Legislation (1983) 14 Pacific L.J. 601.)

The federal act now provides in pertinent part: “(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when— [¶] (1) the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary if the person was alive when the transportation began; [¶] (2) any such act against the person is done within the special maritime and territorial jurisdiction of the United States; [¶] (3) any such act against the person is done within the special aircraft jurisdiction of the United States as defined in section 46501 of title 49; [¶] (4) the person is a foreign official, an internationally protected person, or an official guest as those terms are defined in section 1116(b) of this title; or [¶] (5) the person is among those officers and employees described in section 1114 of this title and any such act against the person is done while the person is engaged in, or on account of, the *883 performance of official duties; [¶] shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment. [¶] (b) With respect to subsection (a) (1), above, the failure to release the victim within twenty-four hours after he shall have been unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away shall create a rebuttable presumption that such person has been transported in interstate or foreign commerce. Notwithstanding the preceding sentence, the fact that the presumption under this section has not yet taken effect does not preclude a Federal investigation of a possible violation of this section before the 24-hour period has ended. [¶]. . . [¶] (d) Whoever attempts to violate subsection (a) shall be punished by imprisonment for not more than twenty years. . . .” (18 U.S.C. § 1201.)

Section 209, as it read following the 1951 amendment, provided: “Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever with intent to hold or detain, or who holds or detains, such individual for ransom, reward or to commit extortion or to exact from relatives or friends of such person any money or valuable thing, or any person who kidnaps or carries away any individual to commit robbery, or any person who aids or abets any such act, is guilty of a felony and upon conviction thereof shall suffer death or shall be punished by imprisonment in the state prison for life without possibility of parole, at the discretion of the jury trying the same, in cases in which the person or persons subjected to such kidnaping suffers or suffer bodily harm or shall be punished by imprisonment in the state prison for life with possibility of parole in cases where such person or persons do not suffer bodily harm. [¶] Any person serving a sentence of imprisonment for life without possibility of parole following a conviction under this section as it read prior to the effective date of this act shall be eligible for a release on parole as if he had been sentenced to imprisonment for life with possibility of parole.” (Stats. 1951, ch. 1749, § 1, p. 4167, italics added.)

Both separate opinions overstate the effect of our decision, arguing it unjustifiably broadens the scope of section 209. (Conc. & dis. opn. of Chin, J., post, at p. 888 [“under the majority’s interpretation, the second requirement Daniels announced—a substantially increased risk of harm—is effectively no requirement at all”]; dis. opn. of Mosk, J., post, at p. 899 [“in future, virtually any act of kidnapping for the purpose of robbery may satisfy the requirement of a substantial. . . increase in the risk of harm to the victim, even when there was no risk of physical injury”].) Daniels, of course, requires more than mere movement that poses a risk of psychological harm; rather, it requires that (a) the movement of the victim be more than incidental to the robbery, and (b) that movement substantially increase the risk of harm, over and above the risk inherent in a standstill robbery.

Even were we to have concluded otherwise, that is, that the trial court erred in suggesting to the jury that a substantially increased risk of psychological harm satisfied section 209, subdivision (b), such “error” would be harmless. The facts of the case demonstrate to a virtual certainty that defendant’s movement of Overacker substantially increased the risk to her of both physical and psychological harm. The record indicates Overacker was forcibly removed from her new home at gunpoint, driven against her will to her bank, then to a convenience store, then to an isolated place in the woods and, finally, to a second bank. Not only was she emotionally terrorized to the point of being physically paralyzed when she was rescued by Officer Tomlin, she was told to drink juice she believed to be poisoned and she reasonably believed her abductors took her to an isolated place in the woods to kill her. That she escaped relatively unscathed physically is beside the point; the evidence shows defendant moved her a substantial distance and that such movement substantially increased the risk to her of both psychological and physical harm. This, then, is not a case in which there was a risk to the victim of psychological, but not bodily, harm.