Filed 1/6/20

# CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION EIGHT

|  |  |
|---|---|
| THE PEOPLE, | B293881 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA072867) |
| v. | |
| ISAAC WILLIAM TAYLOR, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Shannon Knight, Judge. Affirmed in part, reversed in part, and remanded with directions.

Maxine Weksler, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Noah P. Hill, and Paul S. Thies, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Isaac Taylor used a gun to back David Ho four steps towards a dark alley, where Taylor took Ho's wallet. Based on Ho's four steps backwards, a jury convicted Taylor of kidnapping to commit robbery as well as of the robbery itself. We reverse the kidnapping conviction, address sentencing issues, remand for resentencing, and otherwise affirm. Code references are to the Penal Code.

I

Ho worked at a nail salon. On December 22, 2017 at 6:00 p.m., he went out to his usual place to smoke, which was on the sidewalk in front, next to a poster in the salon's large front window that blocked his customers' view of him with a cigarette. Night had fallen. Lighting illuminated the salon's interior and its sheltered front sidewalk, as well as the surrounding plaza and parking lot. But the alley right next to the salon was unlit.

As Ho left through the front door, Taylor happened to walk by on the sidewalk. Taylor passed Ho without pause or comment, but then Taylor circled back. Video evidence showed Taylor returning to Ho about 27 seconds later. Ho testified Taylor yelled "Do you believe in Jesus" two or three times and told Ho to look down, where Taylor was pointing a gun at Ho at waist level.

Taylor told Ho to move back into the alley. Ho obeyed. Taylor did not touch him. Ho testified he took "three, four steps" backward: "a very short distance . . . ."

When Ho stopped, he was at the corner of the building and 12 inches into the unlit alley next to the salon, blocked from everyone's view. Ho was "inside around the corner in the alley . . . ." Taylor demanded Ho's wallet, which Ho surrendered. Taylor said, "there better be money [in the wallet] or you're going to die tonight." Taylor told Ho to walk back into the shop and "don't look back." Ho slowly walked back inside the salon.

A video showed Ho returned to the nail salon about 83 seconds after Taylor approached him the second time.

The jury convicted Taylor of second degree robbery (count 2, § 211) and of kidnapping to commit robbery (count 1, § 209, subd. (b)(1)). It found Taylor used a handgun in the robbery and kidnapping. At sentencing, Taylor admitted a prior serious felony conviction. The trial court sentenced Taylor to 29 years to life for kidnapping (seven years to life doubled due to the prior conviction plus a five-year serious felony enhancement under § 667(a)(1) and a ten-year firearm enhancement under § 12022.53(b)) and 25 years for robbery (five years doubled plus a five-year serious felony enhancement and a ten-year firearm enhancement). The court stayed the robbery sentence under section 654 and imposed fines and fees.

## II

We reverse the kidnapping conviction because Ho's movement was merely incidental to the robbery.

We review the evidence in the light most favorable to the prosecution to see if jurors could have found the crime's essential elements beyond a reasonable doubt. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1263.) As is sometimes the case, this review becomes a question of law about the precise liability rule. (E.g., *People v. Bipialaka* (2019) 34 Cal.App.5th 455, 458–462.) When defining this rule, our review is independent, but we continue to view the facts in the light favorable to the party that prevailed at trial.

The crime at issue is section 209's *kidnapping to commit robbery*, which is aggravated kidnapping, in contrast to simple kidnappings illegal under section 207. How much must kidnappers move victims to commit aggravated kidnapping? The jargon for this issue is "asportation."

The statute sets two requirements:

1. The defendant must move the victim beyond movement "merely incidental" to the robbery, *and*
2. This movement must increase the victim's "risk of harm" beyond that necessarily present in the robbery.  (§ 209, subd. (b)(2).)

Both requirements are essential.  (*People v. Washington* (2005) 127 Cal.App.4th 290, 301.)  The requirements are interrelated.  No minimum distance is required if the movement is substantial.  (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1152 (*Dominguez*).)  In 1997, the Legislature modified the second requirement by replacing the need *substantially to increase* the risk of harm to the victim with a requirement merely *to increase* that risk.  (*People v. Vines* (2011) 51 Cal.4th 830, 869, fn. 20, overruled on other grounds by *People v. Hardy* (2018) 5 Cal.5th 56, 104.)

This case turns on requirement one.  Because Taylor's movement of Ho was merely incidental to the robbery, this was not kidnapping.  This was just robbery.

Turbulent change has shaped this field of the law.

In 1872, California's common law of simple kidnapping required kidnappers to move their victims across county or state lines.  California's 1872 statute codified this rule.  (*People v. Nguyen* (2000) 22 Cal.4th 872, 882 (*Nguyen*).)  This 1872 formulation sharply confined the definition of kidnapping because relatively few assailants take victims across a county line.  Because this conduct is unusual, so too were aggravated kidnapping cases.

This legal situation changed in the 1950s with the decisions in *People v. Knowles* (1950) 35 Cal.2d 175 (*Knowles*) and *People v. Chessman* (1951) 38 Cal.2d 166 (*Chessman).*

The 1950 *Knowles* decision anticipated *Chessman*, and involved Caryl Chessman's confederate.  Knowles and Chessman

4

robbed a store by initially ordering the clerks into a rear stockroom. The robbers forced one clerk back out and then returned him to the stockroom. The Supreme Court held this back-and-forth was kidnapping to commit robbery. (*Knowles, supra,* 35 Cal.2d at pp. 180–186.)

Then the 1951 *Chessman* decision eliminated the requirement kidnappers move victims any distance at all. *Chessman* interpreted the California Penal Code to mean the act of forcibly moving a victim *any* distance, no matter how short or for what purpose, constituted kidnapping: "It is the fact, not the distance, of forcible removal which constitutes kidnaping in this state." (*Chessman, supra,* 38 Cal.2d at p. 192.)

The *Knowles* and *Chessman* decisions greatly loosened the definition of kidnapping, thus making it far easier to charge and to prosecute. Indeed, these decisions threatened entirely to eliminate the distinction between kidnapping on one hand and robbery or rape on the other. Assailants commonly move robbery or rape victims at least *some* distance. Motionless crimes are possible but not customary. Under *Knowles* and *Chessman*, even insignificant movements could add an aggravated kidnapping count to the case. This meant most robberies became kidnappings to commit robbery.

This judicial innovation was a bad idea. Dissenting Justice Edmonds in *Knowles* decried this "startling innovation in criminal law." Justice Edmonds observed this innovation meant the crime of kidnapping "may *merge* into the crime of robbery." (*Knowles, supra,* 35 Cal.2d at p. 190 (dis. opn. of Edmonds, J.), italics added.)

Merging aggravated kidnapping into robbery had an adverse effect. Robbery, although serious, was traditionally less serious than aggravated kidnapping. But merging the two made the extremely severe penalties for aggravated kidnapping

5

available in most or all robbery cases. For instance, today the minimum penalty for kidnapping for robbery is life in prison. (§ 209, subd. (b).) Formerly the penalty could be death. So *Knowles* and *Chessman* virtually invited overcharging.

The *Knowles* dissenters made exactly this forecast. Dissenting Justice Edmonds predicted overcharging was "inevitabl[e]." (*Knowles, supra,* 35 Cal.2d at pp. 190–191 (dis. opn. of Edmonds, J.).) Dissenting Justice Carter used stronger language: "The prosecuting attorney is given the sole and arbitrary power to determine whether a person shall suffer life imprisonment without possibility of parole or even death on the one hand, or, in the case of robbery in the second degree, as little as one year's imprisonment. It all depends on the charge he chooses, at his whim or caprice, to make against the accused. . . . It is not to be supposed that the Legislature intended to place any such drastic and arbitrary power in the hands of the district attorney." (*Knowles, supra,* 35 Cal.2d at pp. 203–204 (dis. opn. of Carter, J.).)

These forecasts, made in dissent, proved true. About two decades later, bad experience with the *Chessman* rule led to its rejection.

Before *Chessman,* the crime of kidnapping had a distinctive status as an extremely grave crime, worthy of distinctively and extremely grave penalties. As Justices Edmonds and Carter perceived, the core problem with the *Knowles* and *Chessman* rule was that it threatened to, or did, abolish this distinctive status. The virtue of retaining aggravated kidnapping as a distinct and distinctively serious offense was lost.

Within decades, the California Supreme Court identified this problem and responded to it. Its 1969 *Daniels* decision revised *Knowles*'s and *Chessman*'s dilution of kidnapping standards, citing sources that lamented inappropriate

prosecutions for kidnapping. (*People v. Daniels* (1969) 71 Cal.2d 1119, 1138 (*Daniels*).)

The *Daniels* case involved multiple charges of aggravated kidnapping where kidnapping distances were minimal: as short as six feet. (*Daniels, supra*, 71 Cal.2d at p. 1126.) *Daniels* held this was not kidnapping.

The *Daniels* decision suggested the *Knowles* and *Chessman* decisions had "eviscerated" the kidnapping statute. (*Daniels, supra*, 71 Cal.2d at p. 1132.) The *Daniels* opinion then quoted the "learned draftsmen of the Model Code," who wrote it was "desirable to restrict the scope of kidnapping, as an alternative or cumulative treatment of behavior whose chief significance is robbery or rape, because the broad scope of this overlapping offense has given rise to serious injustice . . . ." (*Id.* at p. 1138 [quoting Model Penal Code]; cf. *id.* at pp. 1137–1138 [quoting Model Penal Code § 212.1, which recommended kidnappings can arise only if victim is moved a "*substantial* distance from the vicinity where he is found" or if victim is confined "for a *substantial* period in a place of isolation," italics added by *Daniels* opinion].)

To cure the *Chessman* problem, *Daniels* established a new two-part test for kidnapping for robbery, which the Legislature later codified in section 209:

1. The defendant must move the victim beyond movement "merely incidental" to the robbery, *and*
2. This movement must increase the victim's risk of harm beyond the risk necessarily present in the robbery. (§ 209, subd. (b)(2); see *Nguyen, supra*, 22 Cal.4th at pp. 877–878; *Dominguez, supra*, 39 Cal.4th at p. 1150.)

The *Daniels* test aimed to restrict the definition of kidnapping and thereby to reinstate its distinctive character as an extremely serious crime different from robbery or rape. (See

7

*Daniels, supra*, 71 Cal.2d at p. 1132 [mere movement of a victim should not inevitably lead to a kidnapping indictment, because movement is incidental to many crimes].)

The aim of *Daniels* was clear, but the wording of its test created uncertainty. (Cf. *Dominguez, supra*, 39 Cal.4th at p. 1151 ["difficult to capture in a simple verbal formulation that would apply to all cases"].) The same is true of the codification of *Daniels*, which restricts kidnapping to commit robbery to cases where "the movement of the victim is beyond that *merely incidental* to the commission of . . . the intended underlying [robbery]." (§ 209, subd. (b)(2), italics added.)

Experience revealed the ambiguity of this "merely incidental" test. There was no clear and objective way to determine when moving a victim is "incidental" to a robbery. How does one determine what the major part of the robbery was? What is the method for deciding if acts are merely incidental to it?

To determine what is "incidental" about a robbery, courts cannot ask the obvious person: the robber. Taylor did not testify in this case, but more fundamental than this practical obstacle is the fact robberies can be highly opportunistic, as was Taylor's. Ho popped out for a smoke just as Taylor happened to walk by. In the space of 27 seconds, Taylor, with his gun and on the prowl, apparently reacted to Ho's chance appearance by deciding to go back for Ho's wallet. It is unknowable whether Taylor in those seconds formulated some plan featuring major and incidental elements, or whether Taylor just formed a vague notion — "get his wallet" — and resolved to react as events unfolded. The man who authored the event will never say what was central or incidental.

Nor is it easy, after the fact, to impose objective and logical order on a robbery by dividing it into major and incidental

elements.  There is no clear method or meter.  The criteria are amorphous.  Subjectivity imperils this work.

Yet the Legislature unquestionably had something definite in mind when it created this crime in 1901.  (See *Knowles*, *supra*, 35 Cal.2d at p. 194 (dis. opn. of Edmonds, J.) [quoting Stats. 1901, ch. 83, p. 98].)  To be true to legislative intent, we search for the archetypical offense.

Dissenting Justice Edmonds, whose insights were prescient in this field, identified an example from precedent:  *People v. Fisher* (1916) 30 Cal.App. 135, 137 (*Fisher*).  The criminals' goal in this example was to exact from the victim's relatives "money, lands, promissory notes, deeds, real property, personal property, and other valuable things."  (*Fisher*, *supra*, 30 Cal.App. at p. 137.)  Justice Edmonds described the *Fisher* decision like this: "[T]he court prefaced its statement of facts by noting that the record 'reads as though it were a tale of medieval brigandage.'  The defendants seized the victim on the highway and forced him to write a note to his secretary explaining his absence.  They then drove him from Merced to Stockton, where he escaped and they were captured.  Wire-tapping equipment, unsigned deeds to all of the victim's real property and a number of blank promissory notes were found in the automobile.  *This was a clear case of kidnaping for the purpose of robbery*, that is, the property was to be obtained from a victim's person without his consent.  Moreover, viewing the transaction in its entirety, it was an *orthodox* kidnaping."  (*Knowles*, *supra*, 35 Cal.2d at p. 198 (dis. opn. of Edmonds, J.), italics added.)

One can generalize Justice Edmonds's "orthodox" example of *Fisher*.  The classic kidnapping to commit robbery involves a robber taking a victim from one place to another to help get a distant and valuable thing the robber wants:  money from a cash machine, treasure from a home, and so forth.  (E.g. *Nguyen*,

*supra*, 22 Cal.4th at pp. 874–876 [robbers drove victim from her home to ATM to get cash]; *People v. Stathos* (1971) 17 Cal.App.3d 33, 36, 39 [robber drove restaurant owner from his home to restaurant to open the safe], disapproved on other grounds in *In re Earley* (1975) 14 Cal.3d 122, 127–128.)

There was nothing like a classic aggravated kidnapping in this case. Rather, this robbery was just an ordinary robbery. The victim backed up four steps and ended up 12 inches into an alley, where the darkness and the corner screened the robbery, which is where robbers typically want to be: out of public view. Taylor never confined Ho in an isolated room. The whole episode lasted a mere minute and a half. This movement was trivial and incidental to the robbery.

This case has no evidence of *kidnapping* for robbery. (See *Daniels*, *supra*, 71 Cal.2d at p. 1135 ["It is a common occurrence in robbery, for example, that the victim be confined briefly at gunpoint or bound and detained, or moved into and left in another room or place"].)

Many decisions compel this result. First among them is *Daniels* itself, where the distances involved in the several crimes ranged from six to 30 feet. (*Daniels*, *supra*, 71 Cal.2d at p. 1126.) *Daniels* held these "brief movements" were merely incidental to robbery and could not support an aggravated kidnapping charge. (*Id.* at p. 1140.) Under *Daniels*, we must reverse Taylor's conviction for aggravated kidnapping.

The *People v. Williams* (1970) 2 Cal.3d 894, 899–903 (*Williams*) decision presents a second decisive factual scenario. The robbers in *Williams* moved gas station attendant Murry from the cash register to the bathroom, where they locked him up. Then they released Murry and forced him to help them move items outside to a getaway car. Finally they ordered Murry to walk away. After *Daniels*, the Supreme Court in *Williams* ruled

10

this movement was incidental to the robbery.  (*Williams, supra,* 2 Cal.3d at pp. 902–903.)

*Williams* compels reversal of Taylor's kidnapping conviction.  Taylor's movement of Ho was trivial compared to the movement in *Williams.*

To the same effect is *In re Crumpton* (1973) 9 Cal.3d 463, 466 (*Crumpton*), which also followed *Daniels*.  Crumpton and another robbed a gas station attendant.  One robber pointed a gun at the attendant, who had been walking from the service island to the station office.  They forced him down behind a truck parked 20 or 30 feet away on the station premises.  Crumpton emptied the service island's cash box while the other man searched, robbed, and then shot the prostrate attendant.  (*Crumpton, supra,* 9 Cal.3d at p. 466.) The Supreme Court reversed Crumpton's conviction for kidnapping to commit robbery because moving the attendant was merely incidental to the robbery.  The "victim was not compelled to move a substantial distance."  (*Ibid.*)

The robbers in *Daniels*, *Williams,* and *Crumpton* moved their victims more than Taylor moved Ho.  *Daniels*, *Williams,* and *Crumpton* show Taylor's conduct was merely incidental to robbery and was not kidnapping.

Taylor cites *Daniels*, *Williams,* and *Crumpton*.  The prosecution's brief omits mention of these controlling holdings.  At oral argument, the prosecution offered no way to distinguish these cases.

The prosecution cites *Dominguez*, which is consistent with our result.  Assailants abducted a woman from a rural roadside down a 12-foot embankment and 25 feet into an orchard, where they raped and murdered her.  (*Dominguez, supra,* 39 Cal.4th at pp. 1150–1155.)  *Dominguez* applied rather than overruled *Daniels*.  (*Id.* at pp. 1149–1150, 1152, 1153–1154.)  Four steps on

11

a flat sidewalk is less of a distance than an abduction down a 12-foot embankment and 25 feet into an orchard.

*Dominguez* cited *People v. Shadden* (2001) 93 Cal.App.4th 164, 167 (*Shadden*) saying its facts "*might*" show sufficient movement to count as aggravated kidnapping. (*Dominguez, supra*, 39 Cal.4th at p. 1152, italics added.) The use of the word "*might*" was deliberately equivocal. Shadden entered a video store at night, punched the owner, and dragged her back nine feet into a twelve-by-eight-foot back room. Shadden closed the door, tore off the owner's underwear, straddled her, and opened his zipper halfway. But a customer called the owner's name, prompting Shadden to break off the attack. *Shadden* affirmed the conviction for aggravated kidnapping. (*Shadden, supra*, 93 Cal.App.4th at pp. 167–170.) There are many possible distinctions between *Shadden* and this case: nine feet versus four steps, back room versus no back room, rape versus robbery, and so on. We simply note nine feet *might* be enough, but in any event nine feet is more than four steps.

More exquisite is the difference between this four-step case and the recent five-step decision about simple kidnapping in *People v. Singh* (2019) 42 Cal.App.5th 175 (*Singh*). As a stranger, Singh approached a mother holding her one-year-old son. (*Id.* at p. 178.) Singh spoke to the child. The mother spoke only Spanish and could not understand Singh, who touched her son's hand and made gestures trying to coax him off her. The mother told her son to ignore Singh. She stepped into a bus that arrived and put her son down to pay the fare. Singh took the child and walked five steps before the mother ran up and yanked her child back. (*Ibid.*) A jury convicted Singh of simple kidnapping under section 207. (*Id.* at pp. 178, 180.) The Court of Appeal affirmed. (*Id.* at p. 189.) The *Singh* case was a simple kidnapping and posed none of the definitional problems plaguing

aggravated kidnapping.  Beyond the difference between four and five steps, moreover, *Singh* is consistent with our analysis here. The mother rescued her son by interrupting the kidnapper's travel, which shows the actual distance was a poor measure of the intended distance.  (Cf. *People v. Newman* (2019) 40 Cal.App.5th 68, 70–72 [victim traveled 190 feet and finally broke free].)  No rescue or escape interrupted Taylor's movement of Ho, which was merely incidental to the robbery.

The prosecution cites other holdings, but none is pertinent. (See *People v. James* (2007) 148 Cal.App.4th 446, 449–457 [over the course of an hour, victim was moved from parking lot into bingo club, thrown to floor, then confined to bathroom]; *People v. Corcoran* (2006) 143 Cal.App.4th 272, 279–280 & fn. 5 [victims herded 10 feet from public area to small back office without windows and with a solid door; defense conceded movement was substantial].)

The prosecution argues Taylor increased the danger to Ho by backing him into the dark alley.  This argument goes to requirement two and does not change the analysis of requirement one, because this movement was merely incidental to the robbery. The two elements are interrelated but do not subsume each other.

The law is not always simply logical and commonsensical but here it is, and that is desirable because criminal law aims to express and to enforce a community's shared moral intuitions. The average Californian would be surprised to hear four steps backwards could be kidnapping.  And here the average Californian would be right:  that is not a kidnapping under these facts.

In sum, we reverse Taylor's conviction for kidnapping for robbery.

III

We address the trial court's sentencing for the remaining conviction for robbery.  The trial court did not abuse its discretion.

A

The trial court did not abuse its discretion by denying Taylor's request to strike his prior conviction under the Three Strikes law.  (§§ 667, subds. (b)–(i); 1170.12, subds. (a)–(d); 1385, subd. (a).)  Taylor's criminal history includes four convictions for possession or sale of drugs in the 1980s, a 1984 conviction for vehicle theft, a 1991 incident of providing false information to a peace officer for which there was no disposition in the record, a 1992 conviction for robbery with a deadly weapon for which Taylor received three years in prison, a 1993 conviction for robbery for which Taylor received a 12-year sentence, and a Nevada conditional release violation in 2011.  The 1993 robbery conviction was the one Taylor asked the court to strike.

Taylor argues he deserved leniency due to his age, poor health, and because his crimes were "not egregiously" serious.  Taylor cites *People v. Bishop* (1997) 56 Cal.App.4th 1245 and *People v. Garcia* (1999) 20 Cal.4th 490 to argue the trial court should have granted his request to strike his prior conviction, but those cases affirmed trial courts' use of discretion to dismiss strikes, and this court's exercise of its discretion was sound.  Taylor argues a long sentence is inappropriate in light of his age because "all but the most exceptional criminals, even violent ones, mature out of lawbreaking before middle age."  At 55, Taylor seems proof to the contrary.

A repeat criminal falls outside the spirit of the Three Strikes law only in extraordinary circumstances.  (*People v. Carmony* (2004) 33 Cal.4th 367, 378.)  During sentencing, the trial court considered the probation report, records presented by the defense, including Taylor's health records, and evidence

14

presented at trial.  The court noted Taylor's "lengthy" and "fairly consistent" criminal history and found he fell squarely within the Three Strikes law.  The trial court's decision was valid.

B

The trial court did not abuse its discretion in declining to dismiss the five-year serious felony enhancement under section 667(a)(1).  Remand is not warranted on this score.  Senate Bill No. 1393 (2017–2018 Reg. Sess.) (S.B. 1393) amended section 667 to give trial courts discretion to strike five-year sentencing enhancements based on prior serious felony convictions.  Resentencing is not required when the trial court clearly stated it would not in any event have stricken an enhancement.  (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425 (*McDaniels*).)  This trial court discussed the change in the law and said it would "not be inclined to strike the five-year prior" even if it had discretion.  Taylor concedes the trial court "announced its disinclination to strike or reduce" the enhancement but argues this was an abuse of discretion.  It was not, for reasons already given.

The case must be remanded, however, to allow the court to exercise discretion under Senate Bill No. 620 (2017–2018 Reg. Sess.) (S.B. 620).  S.B. 620 gives a court discretion to strike or dismiss a firearm enhancement imposed under section 12022.53.  Although S.B. 620 did not take effect until after Taylor was sentenced, it applies retroactively to convictions that are not final.  (*People v. K.P.* (2018) 30 Cal.App.5th 331, 339.)  Remand is required unless the trial court clearly shows it would not have stricken the firearm enhancement if it did have discretion.  (*McDaniels*, *supra*, 22 Cal.App.5th at p. 425.)  Unlike the five-year serious felony enhancement, the trial court made no statement about what it would do if it had discretion to strike or reduce the ten-year firearm enhancement.  It did not clearly show

15

it would not have stricken the enhancement, so remand is warranted.

IV

Taylor forfeited his *People v. Dueñas* (2019) 30 Cal.App.5th 1157 claims because he did not object to fines and fees in the trial court.  (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1155.)

Taylor contends his trial counsel rendered ineffective assistance by failing to object to the court's assessments and fees without a determination of Taylor's ability to pay.  To prove ineffective assistance of counsel, a defendant must show counsel's efforts fell below an objective standard of reasonableness. (*Strickland v. Washington* (1984) 466 U.S. 668, 688.)  Judicial scrutiny of counsel's performance is highly deferential.  (*Id.* at p. 689.)  We presume counsel's conduct falls within the wide range of reasonable professional assistance.  (*Ibid.*)  Failure to object rarely amounts to constitutionally ineffective representation. (*People v. Boyette* (2002) 29 Cal.4th 381, 424.)  Taylor asserts but does not attempt to demonstrate his lawyer's conduct fell below an objective standard of reasonableness.  We have no basis to find Taylor's counsel rendered ineffective assistance.

In his reply brief, Taylor raises other arguments for the first time.  Taylor has forfeited these tardy arguments.  (*People v. Rangel* (2016) 62 Cal.4th 1192, 1218–1219.)

16

**DISPOSITION**

The judgment is reversed in part, affirmed in part, and remanded with directions. The kidnapping conviction is reversed. The trial court shall amend the abstract of judgment accordingly and forward the abstract to the appropriate correctional office. Because we have stricken part of the sentence, we remand for a full resentencing as to all counts, so the trial court can exercise its sentencing discretion in light of the changed circumstances. (*People v. Buycks* (2018) 5 Cal.5th 857, 893.) We direct the trial court to decide whether it will exercise its newfound discretion to strike the firearm enhancement under S.B. 620. Taylor has the right to be present and to have the assistance of counsel at this remand hearing. (*People v. Rodriguez* (1998) 17 Cal.4th 253, 258–260.) In all other respects, the judgment is affirmed.


WILEY, J.


We concur:


GRIMES, Acting P. J.


STRATTON, J.

17