Filed 9/20/21  P. v. Livingston CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROBERT LEE LIVINGSTON,<br><br>    Defendant and Appellant. | B303241<br><br>(Los Angeles County<br>Super. Ct. No. YA095848-02) |

APPEAL from an order of the Superior Court of Los Angeles County, Edmund Willcox Clarke, Jr., Judge.  Affirmed in part, reversed in part, and remanded.

Joanna Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Michael C. Keller and Wyatt E. Bloomfield, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Robert Lee Livingston (defendant) was convicted of 18 counts of second-degree robbery, two counts of attempted robbery, and four counts of kidnapping to commit robbery after he and a co-defendant robbed a string of AutoZone stores between December 2016 and March 2017. Defendant was sentenced to 21 years and four months in state prison, plus four consecutive life terms. We consider whether defendant's forced movement of four AutoZone customers during the robberies satisfied the elements of aggravated kidnapping, i.e., that the movement was over a substantial distance, more than merely incidental to the robbery, and increased the victims' risk of harm. We also consider (1) whether the aggravated kidnapping jury instruction given, CALCRIM No. 1203, correctly states the "incidental to the robbery" element and (2) whether, as the parties agree, the trial court was unaware of its discretion to impose concurrent sentences—which would require a remand for resentencing.

## I. BACKGROUND

### A.   *The Pertinent Offense Conduct*

#### 1.   *Overview of the robberies*

From December 2016 to March 2017, defendant and Markeith Daniels (Daniels) robbed a series of AutoZone stores. They committed nine robberies, and attempted two others, at stores in Long Beach, Bellflower, Lakewood, Wilmington, Carson, Hawaiian Gardens, and Gardena.

The execution of the robberies followed a similar pattern. Defendant and Daniels arrived at each AutoZone store between 8:00 p.m. and 10:00 p.m. They wore dark gloves and face masks.

At least one of them carried a gun. One also carried a dark-colored backpack.

Defendant and Daniels demanded both the money from the cash registers and the money from the safe in a back area of each store. They directed an employee to place the money in the backpack. As we will describe in more detail, they instructed employees and some customers present in the store to go to the back of the store while the robberies took place.

Of the two attempted robberies, one attempt was foiled by an employee opening the emergency exit and triggering an alarm. The other, which led to Daniels' arrest, did not progress past an attempt because the AutoZone store defendant and Daniels were attempting to rob was already closed when they arrived.

### 2. *The December 21, 2016 robbery*

Cyprian A. and Justin H. were working at an AutoZone store in Lakewood at approximately 9:00 p.m. on December 21, 2016. A customer, who was a regular, was walking out the front door when defendant and Daniels (the robbers) entered, pushing him back into the store.[1] One of the robbers grabbed the customer's shirt and pulled or led him to an area behind the registers, which was near the door. The employees were instructed to go to the back room, or office area, and open the safe. Justin H., who was the manager on duty that night, opened the safe. The robbers gave the backpack to Justin H. and kept the gun pointed at him. Justin H. and the customer began emptying the contents of the safe into the robbers' backpack. At

---

[1] The customer was not identified at trial and he was not an alleged victim of an aggravated kidnapping charge.

4

some point, one of the robbers pulled the customer away from the safe and had him sit on the floor with his head down.

The robbers also instructed the employees to open the black box under the register. Justin H. went to do so and emptied the contents, as well as those of the register, into the backpack. Cyprian A. and the customer remained in the back area.

Shortly before Justin H. reentered the main store area to empty the register, a customer named Jolly E. entered the store. The robber with a gun pointed it at Jolly E. and told him to come to the area behind the registers. That area is surrounded by tall shelving stocked with auto parts. The safe is located below a counter or shelf that runs the length of two or three rows of shelves. Unlike the rest of the store, the back area is not visible from the store's front doors or main windows. The area surrounding the safe was not spacious.

Jolly E. complied and went to the back area because the robber had a gun. Jolly E. was scared for his life and described the feeling of being forced to the back room as akin to being taken hostage. Jolly E. was told to sit on the floor in the back room and did so. Once he was in the back, Jolly E. could no longer see the front door through which he had entered.

Once Justin H. finished emptying the contents of the register and the black box into the backpack, he handed it to one of the robbers and reentered the back area. The robber with the backpack left the store, and the other robber exited shortly thereafter.

### 3. *The January 9, 2017, robbery and kidnappings*

Daniel A. and Rene G. were working at an AutoZone in Carson at around 8:00 p.m. on January 9, 2017. There were

three customers in the store at the time, Juan F., Carlos M., and Carlos's daughter, Frida M. Daniel A. was helping Juan F. when the robbers entered.

One of the robbers pointed a gun at Daniel A. and told him to go into the back. Daniel A. heard one of the robbers tell everybody to go to the back. Rene G. was also instructed to go to the back of the store. The back area was located behind the cash registers. The distance from the front door to the cash registers was approximately 12 feet. The safe was located an additional distance from the cash registers. As described by Daniel A. and depicted in the surveillance footage, the back area was not confined by walls, but by at least five rows of tall shelves with auto parts on them. It had two "pockets" in the shelving, one in which a safe was located, and another in which parts were located. Portions of the area were separated by aisles. Those areas were not visible from the main store door or windows. Daniel A. and Rene G. were directed to where the safe was located.

Juan F. saw one of the robbers had a weapon and became afraid. Juan F. did not understand very much English, and the robbers did not say anything to him that he understood. He went into the back because Daniel A. told him to do so. He did not want to go into the back area and was there against his will. Once there, he could no longer see the front door. He was more afraid while in the back and feared something would happen to him that would leave his family unprotected. Juan F. spent the time in the back looking at the ground and occasionally looking up at the person watching them.

Carlos M. moved to the back area of the store because the robbers told him to do so. He was scared and did not want to

move. He did not just leave the store because he thought something would happen to him if he walked out. Once he and his daughter moved into the back area, they were again moved into a different side of the area. While in the back, Carlos M. kept his head down.

Frida saw one of the robbers was holding a gun. One of the robbers told her it was going to be okay and directed her to move to the back. Frida did not want to go to the back area. She was afraid they would be robbed. She felt more afraid moving there, but she complied because she thought a robber might shoot her if she disobeyed. Once in the back, Carlos M. told Frida to put her head down and she did. When the robbers were taking the money, they told Frida, Carlos M., and Juan F. to move to another aisle in the back area. They were separated from the employees as a result. Frida could not see the front door or another exit from the back area. She was hidden from public view, but she could look through and see other aisles.

Rene G. saw one of the robbers take Carlos M. and Frida to a separate part of the back area. Daniel A. could not see the customers while they were in the back. The customers tried to talk to Daniel A. once they were in the back, but one of the robbers told them to be quiet.

During the robbery, Daniel A. was told to go open up the register and pull out all the money. He tried, but did not have the necessary code. The robbers told Daniel A. to return to the back room, and sent Rene G. to empty the register. Rene G. did so and put the money in a bag. After Daniel A. returned to the back room, and before Rene G. was sent to the register, two additional customers entered the store. They were neither confronted nor detained by the robbers. While in proximity to the

7

safe, Rene G. opened the safe and put the money in the bag. Rene G. then returned to the back area after emptying the contents of the register into the robbers' backpack and they left.

### B.    *The Investigation and Arrests*

The attempted robbery that ended in Daniels' arrest occurred on March 15, 2017.  The police recognized there was a pattern in the series of AutoZone robberies and realized defendant and Daniels had begun to double back to stores they previously robbed.  As a result, Los Angeles Police Department personnel were monitoring an AutoZone in Gardena hoping to catch defendant and Daniels.  That was the aforementioned AutoZone that was closed when defendant and Daniels arrived. When the robbers returned to their car and drove away, a police patrol unit initiated a traffic stop and a vehicle pursuit ensued.

During the pursuit, defendant got out of the car and fled on foot.  An officer pursued him, and defendant dropped a handgun during the chase.  Defendant eventually scaled a wall that bordered a flood channel, which was a 23-foot drop from the top of the wall.  Defendant escaped, presumably by jumping down the flood channel.  Daniels, who was driving, was apprehended at the end of the pursuit.

Police recovered latex gloves in the car and in Daniels' sweatshirt pocket.  They found a black ski mask in the road. Police searched the area through which defendant had fled and recovered a black rubber glove and a doo-rag.  The recovered items were tested for DNA.  Daniels' DNA was found on the latex gloves and the ski mask.  Defendant's DNA was found on the doo-rag and the rubber glove.

Defendant was arrested approximately a month after Daniels. When he was interviewed shortly thereafter, defendant was wearing a cast on his leg. There was a photo of defendant wearing the cast on his Facebook page. In response to a comment on the photo asking how he had sustained the injury, defendant responded he had taken "a leap of faith."

### C. Pertinent Procedural History

#### 1. The information

In December 2017, the Los Angeles County District Attorney filed an information alleging defendant and Daniels committed eighteen counts of second degree robbery in violation of Penal Code section 211,[2] four counts of kidnapping to commit another crime in violation of section 209, subdivision (b)(1), and two counts of attempted second degree robbery in violation of section 664/211. The information further alleged a principal in the alleged offenses was armed with a handgun. It also alleged defendant had a prior strike conviction. The four counts of kidnapping to commit robbery alleged defendant had kidnapped Jolly E. on December 21, 2016 (count 18), and Juan F. (count 28), Carlos M. (count 30), and Frida (count 29) on January 9, 2017.

#### 2. The verdict

Defendant was found guilty of all counts presented to the jury. Specifically, he was found guilty of 18 counts of robbery (counts 1, 3, 10, 12, 13, 15, 19, 21, 23, 25, 33, 34, 36, 38, 40, 42, 44, 46), two counts of attempted robbery (counts 31 and 48) and four counts of kidnapping to commit robbery (counts 18, 28, 29,

---

[2]      Undesignated statutory references that follow are to the Penal Code.

30). The jury also found true the allegations that a principal was armed with a firearm during the commission of the offenses. Defendant later admitted the prior strike conviction allegation.

### 3. *Sentencing*

At sentencing, the trial court expressed doubt that it could materially affect the length of defendant's sentence. The court stated defendant had earned multiple life sentences the court felt it was "obligated to give," as well as separate determinate sentences it was "required to give." The court discussed mitigating factors, including that defendant had not gratuitously inflicted fear upon the victims and that various witnesses spoke or wrote to the court in support of defendant's character. It then stated as follows: "[T]hose things make me want to find ways to not include everything I could include. That being said, if I struck the strike, for example, in determining the determinate sentence, I still have 18 robberies and two attempted robberies, each for a separate victim which I believe the law tells me I must sentence separately and consecutive[ly] . . . ." Later, in discussing the indeterminate term, the court said: "And for the kidnapping counts of which there are four, I believe I'm required to give four separate and consecutive life terms and to include a minimum parole eligibility."

On count 1, the trial court sentenced defendant to the mid-term of three years in state prison and struck the associated alleged sentencing enhancements. On count 3, the court sentenced defendant to one year, consecutive to the principal term in count 1, and again struck all enhancing allegations. The court imposed the same sentence for the remaining robbery counts. The court sentenced defendant to eight months

10

consecutive for each of the attempted robbery counts and struck all enhancements.  The aggregate determinate sentence was 21 years and 4 months.

As to the kidnapping counts, the trial court dismissed the strike allegation in the interest of justice.  It sentenced defendant to an indeterminate life term for each count, with a minimum parole eligibility of eight years.  The court stated the indeterminate life terms were to run consecutive to one another and consecutive to the determinate sentence.  Defendant was to serve the determinate sentence first, followed by the indeterminate sentences with their minimum parole eligibility.

## II.  DISCUSSION

Defendant's challenges to his convictions for kidnapping to commit robbery are unavailing.  Substantial evidence supports the convictions because the movements Jolly E., Juan F., Carlos M., and Frida (the customers) were forced to make were not merely incidental to the robbery and increased their risk of harm beyond that inherent in a robbery.  Their movement was from the main store, in view of the front door, to a back area hidden from public view over a distance that, as can be seen on the surveillance video played during trial, is significant.  Defendant's challenge to the validity of CALCRIM No. 1203 fails because the instruction tracks our Supreme Court's discussion of the statutory requirements and is consistent with persuasive Court of Appeal opinions concerning section 209, subdivision (b)(2)'s requirement that a movement must have increased a victim's risk of harm to qualify as an aggravated kidnapping.

As the Attorney General concedes, however, defendant's challenge to his sentence has merit.  The reporter's transcript of

11

the sentencing hearing demonstrates the trial court believed it was required to impose consecutive sentences for defendant's convictions and appears to have been unaware it had the discretion to impose concurrent sentences. Accordingly, we will reverse the sentence and remand for resentencing.

### A. Substantial Evidence Supports Defendant's Convictions for Kidnapping to Commit Robbery

#### 1. Background law

When considering a challenge to the sufficiency of the evidence to support a criminal conviction, we review the record "'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Westerfield* (2019) 6 Cal.5th 632, 713; see also Evid. Code, § 411 ["Except where additional evidence is required by statute, the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact"]; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.)

A conviction for kidnapping to commit robbery requires proof that the movement of the victim "is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in," the robbery. (§ 209, subd. (b)(2).) "These two elements are not mutually exclusive but are interrelated." (*People v. Vines* (2011) 51 Cal.4th 830, 870 (*Vines*), disapproved on other grounds in *People v. Hardy* (2018) 5 Cal.5th 56.) "'Whether the forced movement of the victim was merely incidental to the target crime, and whether that movement substantially increased the

risk of harm to the victim, "is difficult to capture in a simple verbal formulation that would apply to all cases.'" [Citation.]" (*People v. Williams* (2017) 7 Cal.App.5th 644, 667 (*Williams*).)

### 2. *The movement of the customers was not incidental to the robbery*

"As to whether the movement was more than merely incidental to the commission of the crime, 'the jury considers the "scope and nature" of the movement, which includes the actual distance a victim is moved. [Citations.] There is, however, no minimum distance a defendant must move a victim to satisfy . . .' this element. [Citation.]" (*People v. Simmons* (2015) 233 Cal.App.4th 1458, 1471 (*Simmons*).) Similarly, "[t]here is no rigid 'indoor-outdoor' rule by which moving a victim inside the premises in which he is found is *never* sufficient asportation for kidnapping for robbery . . . ." (*People v. James* (2007) 148 Cal.App.4th 446, 456 (*James*).) If moving the victim to a different location on the premises changes the victim's environment and increases the risk of harm to the victim, that supports a finding that the movement is not merely incidental. (See *People v. Robertson* (2012) 208 Cal.App.4th 965, 984 [concluding "movement of the victim from the back of the garage by a door to the front of the garage next to a large tub of water, was not merely incidental and increased the victim's risk of physical and psychological harm above the risk inherent in the crime of rape"] (*Robertson*).)

Further, "the fact that the movement of a robbery victim *facilitates* a robbery does not [alone] imply that the movement was merely incidental to it." (*James, supra,* 148 Cal.App.4th at 454.) The question is whether there was any

13

gratuitous movement of the victims above that necessary to assist the robbers in obtaining the property. (See *People v. Washington* (2005) 127 Cal.App.4th 290, 299.) "Lack of necessity is a sufficient basis to conclude a movement is not merely incidental; necessity alone proves nothing." (*James*, *supra*, at 455.)

Substantial evidence supports the jury's findings that the movement of all four customers was more than merely incidental to the robberies. We discuss the kidnapping of Jolly E. during the Gardena AutoZone robbery first and the kidnapping of Juan F., Carlos M., and Frida during the Carson AutoZone robbery second.

Jolly E. entered the store while the December 21, 2016 robbery was already in progress. By the time either defendant or Daniels noticed Jolly E. had entered, Justin H. was almost finished, if not finished, loading the contents of the safe into the backpack. Justin H. began emptying the contents of the register into the backpack shortly after Jolly E. entered the store. Defendant did not need to move Jolly E. into the back room to complete the robbery. He could simply have told Jolly E. to stand or sit where he stood. Though the record does not reflect the precise distance Jolly E. was forced to move, the video footage played during trial depicts Jolly E. moving from the inside of the store, on the customer side of the registers, behind the registers and through to the back area where the safe was located. The jury could find this distance was substantial under the circumstances.

Defendant argues the customers were moved solely to enable the robberies to be done without detection by others who might thwart the taking or getaway. This assertion is undercut,

14

among other things, by the fact that the robbers were wearing masks that concealed their identities and the speed with which the robberies occurred—"in and out," as defendant puts it in his briefs. Additionally, Jolly E. was not an employee with potential access to cash. Forcing Jolly E. to the back did not practically give defendant greater access to any money from AutoZone. But the jury could have reasonably inferred that forcing Jolly E. to the back in view of the other employees tended to implicitly convey a gravity of purpose on the part of the robbers that facilitated the robbery, i.e., we are professional criminals, we know what we are doing, we mean business, and "don't try anything" lest these innocent bystanders get hurt.

Juan F., Carlos M., and Frida were already in the store when the January 9, 2017, robbery commenced, but their movement similarly did not aid in the completion of the robbery. Defendant and Daniels were targeting the safe and the register. Moving Juan F., Carlos M., and Frida from the main portion of the store to the back area did not make the targets of the robbery any more accessible. Nor did it decrease the likelihood of detection as, again, the robbers were wearing masks and completed the robberies very quickly. If defendant merely wanted to ensure they would not interfere, defendant could have instructed them to stand or sit where they stood. Instead, the three were forced to move first to the back area of the store with the employees, and then again to a different portion of the back area, in which they were separated from the employees. Though the record does not reflect the exact distance Juan F., Carlos M., and Frida were moved, their double movement, first out of the main store, and then out of the area in which the employees were, was not insubstantial under the circumstances. And again,

15

the jury could have reasonably inferred defendant moved the victims to convey the seriousness of the robbery to the employees. This is underscored by the unmolested entry of two additional customers into the store while the robbery was underway. The jury could have inferred those customers were not detained because, having detained Juan F., Carlos M., and Frida, the robbers no longer needed to impress the gravity of the situation upon the employees and were unconcerned the customers would impede the robbers' ability to make a getaway.

Even assuming for argument's sake, however, that the jury could not reasonably find the customers were moved for reasons other than the robbers' desire to avoid detection, that still would not help defendant win reversal. At least one case discussing an analogous issue held that the act of moving a victim to make a crime easier to commit and to avoid detection was not incidental to the commission of the crime itself. (See *People v. Salazar* (1995) 33 Cal.App.4th 341, 347 ["The movement of [the victim] was not necessarily related to the rape crime itself; rather, a jury could reasonably conclude it was an essential part of Salazar's plan to avoid detection and to make the crime easier to commit"].) This is particularly true here because none of these AutoZone customers were either planned targets or actual victims of robbery. (See *James*, *supra*, 148 Cal.App.4th at 457 [movement of victim from outside of business to inside the business's premises was significant in part because the defendants intended to rob the manager of the business, not the victim].) Defendant and Daniels moved the customers (so the argument goes) to ensure they would not escape during the commission of the robbery and to decrease the possibility that defendant and Daniels would be captured. Their movements were neither

16

incidental to nor a necessary or natural part of the respective robberies.

Defendant argues to the contrary, contending all movements of the customers were incidental to the robberies. To support this argument, defendant cites a handful of cases in which courts deemed the movement of employees of businesses being robbed incidental to the robberies. (See *People v. Ross* (1969) 276 Cal.App.2d 729, 731 [robbers demanded manager move to open back door]; *People v. Adame* (1971) 4 Cal.3d 417, 418 [robbers moved supermarket employees from checkstand and manager's office to safe]; *People v. Adams* (1971) 4 Cal.3d 429, 430 [robbers moved employees around the room and to a rear storage area]; *People v. Hoard* (2002) 103 Cal.App.4th 599, 607 [robber moved jewelry store employees to back office and confined them to give him free access to merchandise and ability to tell entering customers the store was closed]; *Williams*, *supra*, 7 Cal.App.5th at 653 [robbers moved employees to different rooms in store].) These cases are inapposite to the facts here, which involved the movement of customers who were not victims of the robbery and whose movement did not facilitate the robbers' access to the objects they desired to steal.

Defendant further argues an act "incidental" to a robbery cannot mean only an act necessary to the robbery, relying on a dictionary.com definition of "incidental" to mean "likely to happen or naturally appertaining." Even if we were to accept defendant's definition, it would not alter our conclusion. There is no basis in the record to say the movement of customers who happen to be in a store to a back area away from public view is not "likely to happen" in a store robbery.

17

### 3. *The movement increased the customers' risk of harm*

When considering whether a movement increases a victim's risk of harm, the jury ""consider[s] . . . such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. [Citations.] The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased."' [Citation.]" (*Vines*, *supra*, 51 Cal.4th at 870.) "The essence of aggravated kidnapping is the increase in the risk of harm to the victim caused by the forced movement." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1152.)

Substantial evidence also supports the jury's finding on this point. Moving the customers from the back area of the store increased the risk of harm to them. The customers were forced to move from the main portion of the store, in view of the front doors and the large store windows making the inside visible to passersby, to an area where they could not see the front door and were not visible to someone inside the store, much less someone approaching the front door. By moving the customers away from potential public view and from an easy means of escape, and the robbers increased the risk of harm to them. In addition, the customers were moved into more constrained spaces. Jolly E. was crowded into the small area by the safe with another customer and at least one employee. Juan F., Carlos M., and Frida were moved from the more spacious area of the store floor open to customers to a portion of the back where they were surrounded by tall shelves filled with auto parts. These movements to a confined space near the employees that were

18

actively complying with the demands of defendant and his accomplice put them more directly in harm's way and provided defendant "with new opportunities to engage in additional and more dangerous crimes out of public view" as well as "increas[ing] the possibility of something going awry." (*Simmons*, *supra*, 233 Cal.App.4th at 1472.) That defendant did not engage in additional crimes and that nothing did not go awry does not negate the increased risk of either.

Additionally, the jury had sufficient evidence to believe the movement increased the risk of psychological harm to the customers. (*People v. Nguyen* (2000) 22 Cal.4th 872, 885-886 [increased risk of harm includes increase in risk of psychological trauma].) Juan F., Carlos M., and Frida each testified moving to the back made them more scared. Jolly E. testified the move made him feel like he was being taken hostage. The jury could also infer Juan F., Carlos M., and Frida in particular had an increased risk of psychological harm because they were not only moved into the back area, but they were then moved again into a portion of the back area separate from that occupied by the employees.

Defendant resists these points and believes moving the customers did not increase their risk of harm. Defendant's primary contention is the counterintuitive assertion that the risk of harm to the customers actually *decreased* due to the movement, in part because the customers were kept with the employees. This is not a good argument. For one thing, and taking the argument on its own terms, Juan F., Carlos M., and Frida M. were separated from the employees and placed in a different pocket of the back area, from which they could not see or be seen by the employees. For another, defendant's misery loves

19

company argument is unpersuasive given the particular facts of where the customers were moved. They were forced to accompany their armed captors into an area of the store generally off-limits to customers, one that largely hid them from view of others and was far more confined a space—boxed in by tall shelves of auto parts on many sides (as opposed to the more wide open store floor area normally accessible to customers and visible to those on the outside). If a struggle ensued or a gun went off in this more restricted environment to which the customers were forced to move, the customers were at significantly greater risk of getting hurt.

Finally, defendant argues that in other cases in which courts have upheld convictions for kidnapping to commit robbery, the kidnapping victim was used by the robbers to force the robbery victim to surrender the goods being acquired or to aid in their escape and was thus subjected to a higher risk of harm. (See *People v. Laursen* (1972) 8 Cal.3d 192, 200; *Simmons*, *supra*, 233 Cal.App.4th 1458; *James*, *supra*, 148 Cal.App.4th 446; *People v. Baldwin* (1961) 191 Cal.App.2d 83.) That no such facts are present here does not establish the customers were not at an increased risk of harm.

### B. *The Trial Court Did Not Err in Instructing the Jury with CALCRIM No. 1203*[3]

CALCRIM No. 1203 instructs a jury on the elements of kidnapping to commit a specified crime, such as robbery, in

---

[3] The Attorney General contends defendant forfeited the point by failing to object to the jury instruction at trial. But, as defendant argues, we can review any claim of instructional error that affects a defendant's substantial rights whether or not trial

violation of section 209, subdivision (b).  Section 209 is often referred to as California's "aggravated" kidnapping statute because it requires proof of elements not required for a prosecution under the "simple" kidnapping statute (section 207).  (*People v. Martinez* (1999) 20 Cal.4th 225, 232 (*Martinez*), disapproved on other grounds in *People v. Fontenot* (2019) 8 Cal.5th 57.)  In *People v. Daniels* (1969) 71 Cal.2d 1119 (*Daniels*), our Supreme Court interpreted the then-current version of section 209 ("'[A]*ny person who kidnaps or carries away any individual to commit robbery*, . . . is guilty of a felony . . . .") to exclude kidnappings "in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself."  (*Id.* at 1125, 1139.)

Nearly 20 years later, the Legislature codified the asportation element of aggravated kidnapping largely as formulated in *Daniels* and subsequent cases.  (Stats. 1997, ch. 817, § 2, p. 5519 [codified at section 209, subdivision (b)(2)]; see also, e.g., *Martinez*, *supra*, 20 Cal.4th at 232 & fn. 4 ["Section 209(b)(2) thus codifies both [*People v. Rayford* (1994) 9 Cal.4th 1], and a modified version of the [*Daniels*] asportation standard . . . ."].)  As pertinent here, the 1997 version of the statute differed from the prior version by removing the

---

counsel objected.  (§ 1259 ["The appellate court may also review any instruction given . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby"]; *People v. Burton* (2018) 29 Cal.App.5th 917, 923.)  As we go on to explain, there was no such effect here because CALCRIM No. 1203 correctly states the law.

requirement that a movement "substantially" increase the risk of harm. (Stats. 1997, ch. 817, § 2, pp. 5519-5520; *Vines, supra,* 51 Cal.4th at 869, fn. 20 [the 1997 amendment "modified the asportation standard by eliminating the requirement that the movement of the victim 'substantially' increase the risk of harm to the victim"]; *Martinez, supra,* 20 Cal.4th at 232 & fn. 4 ["Unlike our decisional authority, [section 209, subd. (b)(2)] does not require that the movement 'substantially' increase the risk of harm to the victim"]; see also *Robertson, supra,* 208 Cal.App.4th at 978 ["[S]ection 209, subdivision (b)(2) does *not* require the People to prove that the movement *substantially* increased the risk of harm"].)

CALCRIM No. 1203 correctly states the elements of section 209 as it exists today. (Compare CALCRIM No. 1203 [providing the movement "must have increased the risk of [physical or psychological] harm to the person beyond that necessarily present" in the crime] with § 209, subd. (b)(2) [subdivision applies if movement "increases the risk of harm . . . ."].) Indeed, defendant acknowledges the "literal wording" of section 209 provides that the punishment provided in subdivision (b) applies only if the movement of the victim is beyond merely incidental and "increases the risk of harm to the victim over and above that necessarily present in[ ] the intended underlying offense." (§ 209, subd. (b)(2).) Defendant nevertheless contends the legislative history of section 209 demonstrates the Legislature did not intend to modify the *Daniels* asportation test and, as a result, the proper inquiry is still whether a movement "substantially increased" a victim's risk of harm. We find the argument unpersuasive and instead follow *Vines, Martinez*, and *Robertson.*

C. *Remand Is Necessary to Allow the Trial Court to Exercise Its Sentencing Discretion*

"'[W]hen the record shows that the trial court proceeded with sentencing on the . . . assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing. [Citations.] Defendants are entitled to "sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court," and a court that is unaware of its discretionary authority cannot exercise its informed discretion.' [Citation.]" (See *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425 [remanding in light of amendment giving courts with discretion to strike or dismiss firearm enhancements].)

Here, the record shows that when the trial court resentenced defendant, it believed it lacked the discretion to impose concurrent sentences for either the determinate or indeterminate terms. Defendant contends, the Attorney General concedes, and we agree that the trial court had the discretion to impose his sentences either concurrently or consecutively. (§ 669.) The parties further agree the record affirmatively demonstrates the trial court misunderstood its discretion and does not show remand would be futile. Indeed, the record reflects the trial court deliberately chose not to impose the maximum possible sentence and instead expressed at least some inclination to impose a lesser sentence than the one it felt it was bound to impose. We agree that remand is warranted to permit the trial

23

court to exercise its discretion in determining whether defendant's sentences should be concurrent or consecutive.[4]

---

[4] The parties also agree the current abstract of judgment has an error that must be fixed. Specifically, the current abstract indicates appellant's sentence on the aggravated kidnapping charges was seven years to life, when it was instead life with the possibility of parole. Because we remand for resentencing, the point is moot.

DISPOSITION

Defendant's convictions are affirmed.  Defendant's sentence is reversed and the cause is remanded for resentencing.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

RUBIN, P. J.

KIM, J.

25