Filed 11/13/25  P. v. Taylor CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B327033 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA079232) |
| v. | |
| JUSTIN JALEN TAYLOR, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daviann L. Mitchell, Judge.  Reversed in part; Affirmed in part; Remanded for resentencing.

Law Offices of Allen G. Weinberg, Derek K. Kowata for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri and Marc A. Kohm, Deputy Attorneys General for Plaintiff and Respondent.

The jury found Justin Jalen Taylor guilty of the first degree robbery of Sin Lam Yam (Pen. Code,[1] § 213, subd. (a)(1)(A), count 1), misdemeanor child abuse of E.G. (§ 273a, subd. (b), count 3), misdemeanor elder abuse of Yam (§ 368, count 4), kidnapping to commit robbery of E.G. (§ 209, subd. (b)(1), count 5), first degree robbery in concert of Jennifer Kim and Austin Lee (§ 213, subd. (a)(1)(A), count 6), attempted residential burglary of Phong Vo (§§ 459, 664, count 8), residential burglary with person present of Hahn Nguyen (§ 459, count 9), kidnapping to commit robbery of Kim (§ 209, subd. (b)(1), count 11), kidnapping to commit robbery of Lee (§ 209, subd. (b)(1), count 12), and conspiracy to commit residential burglary from January 8, 2020, to June 20, 2020 (§ 182, subd. (a)(1), count 13).[2] The jury found multiple aggravating factors true. In a bifurcated proceeding, Taylor admitted that the crimes were gang-related in counts 1, 2, and 6. (§ 186.22, subd. (b)(4).) He further admitted that he suffered a prior strike conviction within the meaning of the Three Strikes law. (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d).) The trial court sentenced Taylor to three consecutive terms of 14 years to life, plus a total consecutive aggregate determinate term of 27 years four months.

On appeal, Taylor contends: (1) the evidence was insufficient to support his convictions for kidnapping to commit

---

[1] All further statutory references are to the Penal Code.

[2] The jury found Taylor not guilty of robbery in concert of E.G. in count 2. (§ 213, subd. (a)(1)(A).) Former co-defendant Shadrach Skinner was the named defendant in counts 7 and 10.

robbery in counts 5, 11, and 12; (2) the trial court abused its discretion by admitting a rap video that was unduly prejudicial under Evidence Code sections 352 and 352.2, and racially discriminatory in violation of the Racial Justice Act; (3) the trial court violated section 654's prohibition on multiple punishment by imposing sentences in counts 1, 3, and 4, in addition to the sentence in count 5 (child abuse of E.G. and Yam robbery), and by imposing sentences in counts 11 and 12, in addition to the sentence in count 6 (Kim and Lee robbery); and (4) the abstract of judgment contains clerical errors that must be corrected. The People concede that the abstract of judgment contains clerical errors, but contest Taylor's other claims.

We reverse Taylor's convictions for kidnapping to commit robbery in counts 11 and 12, reduce the convictions in counts 11 and 12 to the lesser included offense of felony false imprisonment by violence or menace, and remand for a full resentencing. We do not address Taylor's contentions relating to sentencing—i.e. multiple punishment and errors in the abstract of judgment—as Taylor may raise those issues with the trial court at resentencing. In all other respects, we affirm the trial court's judgment.

## FACTS

### A. *Background*

Taylor was a member of the Pasadena Denver Lanes (PDL) criminal street gang. Taylor and several other PDL members and associates, including former co-defendant Shadrach Skinner, Anthony Jackson, Ahmir Davis, and Danual Bright conspired to

3

commit, attempted to commit, and did commit several robberies and burglaries.

At trial, evidence was presented that, prior to commission of the crimes charged in the present case, Taylor and Skinner were involved in other robberies and burglaries. In August 2017, Skinner robbed the Latino Cellular store. Skinner used a handgun in the robbery. On April 19, 2018, Taylor and another man burglarized the home of Guang Qiang Gao, stealing jewelry. Skinner admitted that in November 2019 he and others burglarized a residence in Palmdale.

The prosecution also presented evidence that between January and March 2020, Davis sent and received numerous texts regarding potential burglaries. In February 2020, Davis texted that "Baby H," which was Taylor's moniker, wanted to discuss the plan to burglarize one of the homes.

**B.** ***Attempted Burglary of Vo***

In the morning on February 12, 2020, Los Angeles County Sheriff's Department Sergeant James Medrano received a call for burglary at Phong Vo and Hahn Nguyen's residence. A neighbor had noticed a red car dropping off two men and then doing a U-turn at the end of the cul-de-sac. The men jumped a fence and went into Vo and Nguyen's back yard. The neighbor photographed the car and the license plate number. She told Sergeant Medrano that she heard movement in the back yard and then a few minutes later the men came back over the fence and left in the red car. When Vo returned home a little while later, he and an officer inspected his home and discovered that a window screen in the rear of the house had been damaged.

4

Surveillance video taken from the area depicted Taylor near Vo and Nguyen's residence, and later showed him running away from the residence. Taylor was accompanied by a man wearing clothing that was consistent with the clothing Jackson wore in a video recording of the rap "Knock It Off"—a video in which Taylor and Skinner rapped about robbing Asian residences.[3] The video also depicted a red car that the police had stopped on January 31, 2020, near Vo and Nguyen's home. Jackson was a passenger in the car when it was stopped in January.

## C.    *Kim and Lee Robbery*

In the evening on February 12, 2020, 73-year-old Austin Lee and his wife Jennifer Kim were working at the jewelry store they owned. Lee left the store before Kim, at about 6:50 p.m. Lee arrived home at about 7:10 p.m. Kim arrived home about 10 minutes after Lee. Unbeknownst to Kim and Lee, Taylor, Jackson, and Skinner arrived at their home at approximately the same time as Kim.

When Kim got home she pulled into the garage. It took her about 5 minutes to gather her things, and the garage door was open during that time. Kim got out of her car and went to the door to her house. She was pressing the button to close the garage door when a man who Kim later identified as Taylor approached, pushed her to the floor, and held a gun to her head. Kim started screaming. Taylor covered her mouth. He warned her that if she shouted he would shoot her. Taylor told Kim to

---

[3] The video is discussed in detail in Discussion section B.

give him her money and jewelry.  Kim took off her diamond ring and Rolex watch and gave them to Taylor.  She handed Taylor her purse and told him all her money was in it.  The garage door was closed during the attack.  Kim believed that the man attacking her and two additional men had come in when she had opened the garage to drive in.

Meanwhile, Lee heard the door to the attached garage open, so he went to the door to open it for Kim.  Lee had no inkling that anyone other than Kim would be in the garage.  When he opened the door he was punched in the face or hit with something.  The blow knocked him to the ground.

Taylor dragged Kim into the house.  Kim did not stand up after Taylor pushed her initially, so he dragged her on the ground.  Taylor pulled Kim by the collar of her clothing.  Taylor was holding a gun as he dragged Kim.

The man who hit Lee dragged Lee approximately 20 feet into his daughter's bedroom.  He pulled Lee by his bathrobe, which came off.  Lee told the robbers he would give them anything, just not to hit him.  He could hear Kim screaming continuously.

As they were moving Kim and Lee, the robbers took and broke Kim and Lee's cell phones.  The robbers had to drag Kim and Lee past the master bedroom to put them in their daughter's room.  There were no exits at that end of the hallway.  Taylor pulled Kim into the bedroom with Lee and pointed a gun at both of them.  Taylor told them to put their heads down and not to look at anything.  Two of the men began searching the house.  One man stayed with them in the bedroom.  The robbers did not take anything from Lee's daughter's room.

The men passed the bedroom regularly and told Kim and Lee not to look up or they would shoot them. Someone entered the room and ordered Kim to take off her earrings. Kim put her head up to remove her earrings. The man had a pillowcase full of items. He put the earrings in the pillowcase. Kim and Lee remained in the room throughout the robbery. The robbers threatened to shoot Kim and Lee if they left the room. The robbers told Kim and Lee to count to 100 and not to get up until they were finished counting. Then the robbers left. Kim and Lee went to their neighbor's house and called the police.

Lee was injured by the blow to his face. He had a black eye and a paralyzed nerve on the right side of his face. Lee could not see properly for about 10 days due to swelling around his eye. Lee also had a bloody lip from being dragged.

The robbers stole a gun and some cash from Lee. The parties stipulated that Lee's gun was a Springfield Armory .40 caliber semiautomatic pistol XD.

Lee had approximately six surveillance cameras set up inside and outside of his house that captured the attack. The video was played for the jury. Taylor was depicted in the same clothing that he was wearing in the attempted burglary of Vo's house earlier that day. The video also depicted Jackson wearing the same clothing that he had worn in the prior attempted burglary of Vo's house.

Taylor's DNA was found on the vest and turtleneck Kim had been wearing the night of the robbery.

**D.** *Residential Burglary with Person Present of Hahn Nguyen*

On March 12, 2020, at about 11:50 a.m., Sergeant Medrano received a call of another burglary at Vo and Nguyen's residence. When the sergeant arrived, he observed that someone had forced entry into the home by kicking in the front door. Nguyen was present at the house and spoke with the sergeant. Vo arrived shortly thereafter. Vo told the sergeant that he had called the police.

Sergeant Medrano recovered surveillance footage showing Taylor's car traveling on Vo and Nguyen's street at around 9:00 a.m., making a U-turn, and stopping by Vo and Nguyen's home. The video depicts Skinner and Jackson exiting the vehicle. The driver does not exit Taylor's vehicle. Skinner and Jackson can be seen walking onto the couple's property. The video shows a shoe going over the fence. Video of the interior of Vo and Nguyen's house captures a sound like a door being kicked in, and then Skinner and Jackson can be seen approaching the bedroom. Later, Skinner and Jackson exit through the front door and run across the street. Skinner and Jackson return to Taylor's vehicle.

Video taken on March 11, 2020, was also recovered from the house behind Vo and Nguyen's. It depicts Taylor's car on the street and shows Taylor and Skinner observing the area.

**E.** *Knock It Off Video Posted to YouTube*

On March 27, 2020, Taylor sent Jackson a link to a YouTube video entitled "Knock it Off," in which Taylor, Skinner, and Jackson appear. Taylor and Jackson rap about gang

8

activities and burglaries.  A gun depicted in the video matches the gun that was stolen from Lee.  Excerpts of the video were played for the jury.

## F.   *Child Abuse of E.G. and Yam Robbery*

On June 19, 2020, Yam lived with her daughter and her four-year-old grandson E.G.  Yam and E.G. were at home around 9:30 p.m. watching TV.  Yam heard breaking glass.  Three men, later identified by Yam as Taylor, Bright, and Davis, entered the house through the back door.

One of the men jumped over the couch, grabbed Yam by the jaw, and covered Yam's eyes and mouth.  The man who was covering Yam's face pressed her jaw so hard that he broke her dentures.  Yam could barely breathe and thought she would suffocate.

A second man picked up E.G. under his armpits, carried E.G. to the bathroom on the first floor, and dropped him into the bathtub.  A third man, later identified as Taylor, ran upstairs and began stealing items.  The man who took E.G. to the bathroom pulled bracelets off of E.G.'s arms while E.G. was crying in the bathtub.  This hurt E.G., and left red marks and bruises on his wrists.  Yam heard the bracelets that E.G. had been wearing hit the floor.  The bracelets, which were later recovered, had broken clasps.  The man closed the bathroom window, which the family always kept open.  He left E.G. in the bathtub and closed the bathroom door.  E.G. crawled out of the bathtub and went to the living room to find his grandmother.  E.G. saw a man holding his grandmother's jaw.  One of the men saw E.G. and put him back in the bathtub.  E.G. stayed in the

9

bathtub because he did not want the men to kidnap him. He was very scared.

The robbers turned out the lights in the living room and the kitchen. They remained inside the house for 30 to 40 minutes. The men were talking, but Yam did not understand most of what they said because she does not speak English. She heard them say "Money, Money." The man who was holding Yam's face released her and the robbers left.

Afterwards, Yam was so upset that she urinated on herself and rolled on the floor for about five minutes. It took her 10 to 15 minutes to be able to get up and get E.G., who was still in the bathroom crying. When Yam went to the bathroom, both the door and the window were closed. E.G. was in the bathtub and could not get out. When Yam picked E.G. up, he was still screaming loudly. Yam pressed the alarm for home security and then called her children and told them to call the police.

Los Angeles County Sheriff's Deputies Juan Arroyo and Zachary Gregg reviewed surveillance video collected in the area of Yam's home. Deputy Gregg identified a silver Mercedes in the area at 9:23 p.m. that matched Taylor's car; the car had been used in other recent burglaries. Later that night, at about 12:30 a.m., Deputy Arroyo observed a silver Mercedes in the area. The deputy ran the Mercedes's license plate and learned that it was registered to Taylor. The deputy performed a traffic stop. Bright was driving the Mercedes, and Taylor and Davis were passengers. The car contained large amounts of cash, a hammer, face coverings, and gloves. In a field show-up that night, Yam identified Taylor, Bright, and Davis as the individuals who robbed the house.

# DISCUSSION

## A.   *Sufficiency of Evidence of Kidnapping for Robbery (Counts 5, 11, and 12)*

In the opening brief, Taylor contends there is insufficient evidence to support the jury's verdicts of kidnapping for robbery (§ 209) in counts 5 (E.G.), 11 (Kim), and 12 (Lee).  He argues there was insufficient evidence that:  (1) the victims were moved a substantial physical distance; (2) the movements were not incidental to the robberies; and (3) the movements increased the risk of harm to the victims.  In the respondent's brief, the People disagree, but in the alternative, they contend there is sufficient evidence to support Taylor's conviction of either the lesser included offense of kidnapping by force or fear  (§ 207, subd. (a)) or felony false imprisonment by violence or menace  (§§ 236, 237).

Following our initial review of the matter, we invited the parties to file supplemental briefing regarding whether it would be appropriate to reduce the kidnapping for robbery convictions to a lesser-included offense, in the event that this court reversed one or more of the convictions.[4]  In supplemental briefing, the People maintained their position that in all three counts substantial evidence supports a conviction for kidnapping by force or fear or for felony false imprisonment by violence or

---

[4] Although in the respondent's brief the People argued that the convictions could be reduced to a lesser included offense, they provided little substantive argument.  In the reply brief, Taylor did not respond to the People's argument.  He argued only that double jeopardy prohibits retrial on the kidnapping for robbery convictions if they are not supported by sufficient evidence.

11

menace. Taylor agrees that the convictions may be reduced if the evidence is insufficient to support the kidnapping for robbery convictions, but argues there is insufficient evidence to support a conviction for kidnapping by force or fear in any of counts 5, 11, and 12. Taylor concedes, however, that the evidence is sufficient to support a conviction for felony false imprisonment by violence or menace in all three counts.

We conclude that substantial evidence supports the conviction for kidnapping for robbery of E.G. in count 5. However, we agree with Taylor that there was insufficient evidence to support his convictions for kidnapping for robbery in counts 11 (Kim) and 12 (Lee). The robbers' movement of Kim and Lee was a short physical distance, was incidental to the robbery, and did not increase the risk of harm to either victim. We also agree with Taylor that the evidence is insufficient to support a conviction of kidnapping by force or fear, but it is sufficient to support a conviction for felony false imprisonment by violence or menace. We therefore, reverse the convictions in counts 11 and 12 and modify the judgment to reduce each of these two convictions to felony false imprisonment by violence or menace. We further remand the matter to the trial court for a full resentencing.

### 1. **Legal Principles**

"In evaluating a claim of insufficient evidence, ' "we review the whole record to determine whether . . . [there is] substantial evidence to support the verdict . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the

12

light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." ' [Citation.] ' " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' [Citation.] Thus, we must affirm ' " 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." ' [Citation.]" (*People v. Waqa* (2023) 92 Cal.App.5th 565, 576.)

Kidnapping for robbery (§ 209) "requires a simple kidnapping in which the movement 'increase[d] the risk of harm to the victim over and above that necessarily present in . . . the intended underlying offense.' (§ 209, subd. (b)(1)–(2); see *People v. Rayford* (1994) 9 Cal.4th 1, 11–12.)" (*People v. Waqa, supra*, 92 Cal.App.5th at p. 577.) The increased risk may be of either physical or psychological harm. (*People v. Nguyen* (2000) 22 Cal.4th 872, 886.)[5]

"In general, 'to prove the crime of [simple] kidnapping [(§ 207)], the prosecution must prove three elements: (1) a person

---

[5] In both the appellant's opening and reply briefs, Taylor relies on language from *People v. Timmons* (1971) 4 Cal.3d 411, to contend that only an increased risk of "significant physical injuries" qualifies as an increased risk of harm from asportation. Appellant fails to cite our Supreme Court's subsequent holding in *People v. Nguyen, supra*, 22 Cal.4th at p. 886, that a substantial increase in the risk of psychological harm satisfies the requirements of section 209, subdivision (b); nor does Taylor acknowledge the *Nguyen* court's specific statement that *People v. Timmons* did not address psychological harm as anything more than dicta. (*Id.* at p. 879.)

13

was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance.' [Citation.]" (*People v. Hartland* (2020) 54 Cal.App.5th 71, 77.)

Our Supreme Court has "addressed the asportation element for simple kidnapping in *People v. Martinez* (1999) 20 Cal.4th 225. [The court] explained that, in determining whether the movement in question was ' " 'substantial in character,' " ' 'the jury should consider the totality of the circumstances.' (*Id.* at p. 237.) 'Thus, in a case where the evidence permitted, the jury might properly consider not only the actual distance the victim is moved, but also such factors as whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes.' (*Ibid.*)" (*People v. Hin* (2025) 17 Cal.5th 401, 469.)

" '[I]n a [simple kidnapping (§ 207) or kidnap for robbery (§ 209)] involving an associated crime, the jury should be instructed to consider whether the distance a victim was moved was incidental to the commission of that crime in determining the movement's substantiality. . . . [S]uch consideration is relevant to determining whether more than one crime has been committed, and is amply supported by the case law.' [Citation.] An associated crime for the purposes of simple kidnapping 'is *any* criminal act the defendant intends to commit where, in the course of its commission, the defendant also moves a victim by force or fear against his or her will.' [Citation.]" (*People v. Williams* (2017) 7 Cal.App.5th 644, 671.) Whether movement is

14

incidental and whether it increased the risk to the victim " ' "are not mutually exclusive, but interrelated".' [Citation.]" (*People v. Hin*, *supra*, 17 Cal.5th at p. 470.)

" '[If] in the course of a robbery a defendant does no more than move his victim around inside the premises in which he finds him [or her]—whether it be a residence, . . . or a place of business or other enclosure—his conduct *generally* will not be deemed to constitute the offense proscribed by section 209.' ([*People v.*] *Daniels* [(1969) 71 Cal.2d 1119,] 1140 (italics added.) Indeed, '[m]ost movements that have been found to be insubstantial or merely incidental to the underlying crime have been within a building [citations], or within the premises of a business.' (*People v. Power*[(2008)] 159 Cal.App.4th [126,] 139.)" (*People v. Leavel* (2012) 203 Cal.App.4th 823, 834.) It is not unusual in the course of a robbery for a robber to move the victims to "one spot" to make it easier for the robber to search for valuables and flee undetected. (See, e.g., *id*. at p. 836.) Although "measured distance is relevant, . . . 'no minimum distance is required to satisfy the asportation requirement' . . . 'so long as the movement is substantial' ([*People v. Dominguez* (2006) 39 Cal.4th 1141,] 1152), and 'each case must be considered in the context of the totality of its circumstances.' (*Ibid*.)" (*People v. Corcoran* (2006) 143 Cal.App.4th 272, 279 [holding that movement of 10 feet was a substantial distance in connection with a robbery].)

## 2. <u>Analysis</u>

### a. *E.G.* (*Count 5*)

Substantial evidence supports the jury's finding that the robbers' movement of E.G. was not incidental to the robbery. The robbers separated E.G. and Yam rather than leaving E.G. in the living room with his grandmother, where he was located when they entered the house. Taylor offers no reason for how twice separating the four-year-old child from his grandmother facilitated the robbery. Having E.G. in the bathroom away from Yam did not make it easier for the robbers to confine E.G. In fact, the opposite was true—E.G. testified that he left the bathroom to find his grandmother and one of the robbers had to pick him up and take him back to the bathroom. It was also not necessary to move E.G. to steal his bracelets. E.G. was wearing the bracelets on his wrists. The robbers could have removed them in the living room.

Substantial evidence also supports the jury's finding that the movement increased E.G.'s risk of psychological harm above that required to effectuate the robbery. The robbers broke a glass door, entered the living room, grabbed E.G.'s grandmother, and broke her dentures. After E.G. witnessed this violence, one of the robbers carried E.G. to the bathroom and dropped him into the bathtub. The robber closed the window and the door, which the family always kept open. E.G. knew his grandmother had been harmed but could not see her. He crawled out of the bathtub to find her. One of the robbers then forcibly returned E.G. to the bathtub, where E.G. sat and cried for approximately 45 minutes. The emotional turmoil and anxiety that a young child is likely to

16

experience when carried away from a family member by people who he witnessed harming that family member creates a risk of psychological harm greater than that required to carry out a robbery. The robbers could have kept E.G. and his grandmother together while they carried out the robbery and prevented E.G. from experiencing the fear of separation, not knowing whether his grandmother was safe. In his briefing, Taylor offers no argument whatsoever that this evidence falls short of supporting a jury finding of psychological harm to E.G.; rather, Taylor's only contention is his erroneous legal argument (which we have rejected above) that an increased risk of physical harm is necessary to meet the elements of kidnapping for robbery.

That E.G. was transported a short distance within the house does not undermine our conclusion. It was not necessary for the robbers to move the child at all to steal items from him or from the house, and moving E.G. increased his risk of psychological harm. Under these circumstances, the distance was substantial. Substantial evidence supports the conviction in count 5.

b.  *Kim* (*Count 11*) *and Lee* (*Count 12*)

The circumstances of the kidnapping for robbery in counts 11 and 12 differ significantly from those in count 5. The movements of both Kim and Lee were incidental to the robbery. The robbers grabbed Kim in the garage attached to the couple's home as she was preparing to enter the house. They grabbed Lee just inside the house as he was opening the garage door. The robbers moved both Lee and Kim to a bedroom less than 30 feet away. The garage was attached to the house and part of the

17

same premises, so there was no point at which the victims were taken outside. The garage door was closed when the robbers moved Kim and Lee, so they were already shielded from public view prior to asportation. Kim and Lee stayed together in the bedroom for the duration of the robbery. One of the robbers guarded them while the other two robbers stole items from the house. The movement was consistent with the usual movement of robbery victims—victims are often taken to a single, secure location within a building so that the robbers can supervise them and steal their valuables without interruption.

Additionally, the robbers did not increase the risk of harm to Kim and Lee by moving them. Taylor knocked Kim down and held a gun to her head when she was in the garage, but that conduct occurred prior to moving her. The danger to Kim did not increase during or because of the subsequent movement; rather, once she had been moved, the danger was arguably lessened. The men told Kim and Lee to put their heads down and not to leave, but they did not touch Kim again. Kim sat on the floor next to Lee. Similarly, Lee was hit in the head as he stood in the doorway connecting the house and the garage, prior to being moved. The robbers did not employ additional physical violence to move him to the bedroom, where he sat on the floor with his wife untouched.

In light of the fact that the movement (1) was only a short distance within two connected structures (in Kim's case) and within the residence (in Lee's case); (2) did not decrease the chances of detection; (3) was incidental to the robbery; and (4) did not increase the risk of harm to the victims, we cannot conclude that substantial evidence supports the convictions of kidnapping for robbery in counts 11 and 12.

18

"Where, as here, the appellate court finds there is insufficient evidence to support a conviction for a greater offense, we may modify the judgment of conviction to reflect a conviction for a lesser included offense.  (§§ 1181, subd. 6, 1260; see *People v. Bailey* (2012) 54 Cal.4th 740, 748.)" (*People v. Ellis* (2025) 108 Cal.App.5th 590, 601.)  "Our Supreme Court 'has long recognized that under [] sections 1181, subdivision 6, and 1260, an appellate court that finds that insufficient evidence supports the conviction for a greater offense may, in lieu of granting a new trial, modify the judgment of conviction to reflect a conviction for a lesser included offense.' (*People v. Navarro* (2007) 40 Cal.4th 668, 671, fn. omitted.)"  (*People v. Hamilton* (2018) 30 Cal.App.5th 673, 685.)

Here, the trial court instructed the jury on the lesser included offenses of kidnapping by force or fear and false imprisonment by violence or menace.  Neither party contests that these are lesser included offenses of kidnapping for robbery.

As we have discussed, simple kidnapping by force or fear requires that the movement of the victim be a substantial distance.  (*People v. Hartland*, *supra*, 54 Cal.App.5th at p. 77.)  Because the evidence is insufficient to support this element, we cannot reduce the convictions to kidnapping by force or fear.  (See *People v. Ellis*, *supra*, 108 Cal.App.5th at pp. 599–600 [insufficient evidence of kidnaping where victim was not moved a substantial distance].)

"Section 236 defines false imprisonment as 'the unlawful violation of the personal liberty of another.'  False imprisonment occurs 'when "the victim is 'compelled to remain where he does not wish to remain, or to go where he does not wish to go.' " '  [Citation.]  False imprisonment is a felony if, as stated in section

19

237, subdivision (a), 'false imprisonment [is] effected by violence [or] menace.' Violence is ' " ' "the exercise of physical force used to restrain over and above the force reasonably necessary to effect such restraint." ' " ' [Citation.] ' "Menace" ' is defined as " ' "a threat of harm express or implied by word or act." ' " ' [Citation.]" (*People v. Williams, supra,* 7 Cal.App.5th at p. 672.) Unlike kidnapping for robbery and kidnapping by force or fear, to prove a charge of false imprisonment "[n]o asportation is required. . . . 'Indeed, false imprisonment can occur with *any* movement or *no* movement at all.' [Citation.]" (*Ibid.*)

The People alleged as to counts 11 and 12 that Taylor was armed with or used a weapon at the time of the commission of the crime within the meaning of Rules of Court rule 4.421(a)(2). The prosecution presented evidence that Taylor held a gun to Kim's head and that while Kim and Lee were held in the bedroom Taylor threatened to shoot them if they put their heads up. The jury found the aggravating factors true in both counts. The use of a weapon is sufficient evidence to support felony false imprisonment by violence or menace. (*People v. Williams, supra,* 7 Cal.App.5th at p. 672.)

Accordingly, we reverse the convictions for kidnapping for robbery in counts 11 and 12, and modify the judgment to reduce the convictions in counts 11 and 12 to felony false imprisonment by violence or menace. We remand the matter for a full resentencing as to all counts, so that the trial court can exercise its sentencing discretion in light of the changed circumstances. (*People v. Ellis*, *supra*, 108 Cal.App.5th at p. 601; *People v. Buycks* (2018) 5 Cal.5th 857, 893.)

## B.    *Admission of Rap Lyrics*

Taylor next contends that the trial court abused its discretion by admitting rap lyrics that were inflammatory and racially biased in violation of Evidence Code sections 352 and 352.2, and the Racial Justice Act (§ 745).  Taylor further contends that the error was one of Constitutional magnitude, not merely state law error.  His claims lack merit.

### 1.    <u>Proceedings</u>

At trial, defense counsel objected, pursuant to Evidence Code section 352 and soon-to-be-effective section 352.2,[6] regarding the admissibility of artists' creative expression in criminal proceedings, to admission of a rap video entitled "Knock It Off."  On March 27, 2020, Taylor's Facebook account was used to message a link to the video to Jackson's account.  Taylor, Skinner, and Jackson all appeared in the video.

In a hearing outside the presence of the jury, the trial court informed the parties that, in an abundance of caution, the court intended to rule as if Evidence Code section 352.2 was currently effective and retroactive.  The prosecutor argued that the rap video was admissible under Evidence Code section 352.2 because it was uploaded to YouTube close in time to the burglaries, and in the lyrics, Taylor talks about gang members committing robberies together.  Taylor rapped: "459 gang activities, ' that's how we livin', completing burglary after burglary after trying to

---

[6] At the time of Taylor's 2022 trial, Evidence Code section 352.2 had been enacted but would not become effective until January 1, 2023.

touch a ticket.' " Skinner is also depicted in the video rapping about committing burglaries and flocking (robbery in gang slang). Jackson also appears in the video. Skinner flashes a gun that is very similar to the firearm that was stolen from Lee only a month earlier.

The court observed that the video was released within days of crimes involving Asians. In the song, Taylor mentioned jewelry, with a reference to diamond grade—"VVS"—and a Rolex watch. Taylor also twice rapped about the robbers arming themselves, and said that robberies and gang activities were how they are living. The court concluded, "that's directly on point, close in time, has a sufficient level of similarity to the crimes' charges, and includes factual details not otherwise publicly available, including the references to the watch, to the jewelry. [¶] [Skinner said] I'm in a Chinky spot. All the victims were Asian in this situation." The lyrics made references to Skinner and Taylor committing the crimes together, Skinner and Taylor being broke but now having thousands, and ended with "on bloods, we're gonna knock-knock," which refers to the home invasion burglaries. The court admitted the lyrics it had deemed highly relevant, but excluded the remainder. The court found that the probative value of the excerpted lyrics greatly outweighed any potential prejudice.

Defense counsel objected to the prosecutor's transcript with respect to the words "band days" which counsel thought might have been "bandaids", and the court agreed to admonish the jury that the transcript was not the evidence, and that jurors were permitted to write on their transcripts if they heard something different than what was reflected in the transcription. The court

also stated that it intended to admonish the jury not to speculate as to the content of any of the excluded lyrics.

At trial, the court admonished the jury as the court had indicated it would. The court permitted the prosecution to play the entire video for the jury, but only permitted the prosecution to play the audio recording for the following lyrics:

"Taylor: Lane life. Yeah. See, it gets slimy in my residential. Better keep it on you or your mama might need some tissues.

"It's active. It's brackin', and, man, I swear it's on some other shit. That's on the gang, I wouldn't strip the [derogatory racial epithet] out of his VVS's.

"Yeah, and I should have got his Rolly with it. Yeah. Without the gang two times, like, for surely did it. Little homies packing the pistol, trippin'. They on a mission. Lurking all through the opposition, trying to catch him slippin'.

"459 and gang activities that's how we livin', committing burglary after burglary, trying to touch a ticket.

[REDACTED]

"Skinner: I'm all in Chinky spot for the band days.

[REDACTED]

"Skinner: [Derogatory racial epithet], don't get sprayed. I'ma start ripping in this bitch if I don't get paid. You ain't gangster, [derogatory racial epithet].

[REDACTED]

"Skinner: Glad that he got saved. Brazy how the gang behaved. Guns making [derogatory racial epithet] brave. I'm out here bumming like braids, but I ain't from the '80s phase. Me and HB doing plays.

"Taylor: Big plays.

"Skinner:  We was just broke.  I remember them days. Couldn't even buy a 40 and now we strapped with K's.

"Taylor:  Smashin'.

[REDACTED]

"Taylor:  Set, blood, on them [derogatory racial epithet], bro.  Set, blood.  Real go-getters though, blood.  We ain't out there on no playin' shit, [derogatory racial epithet].  Young bloods, [derogatory racial epithet].  We out your shit.  We in your shit, [derogatory racial epithet].  On, bloods, we're gonna knock-knock."

Sergeant Lohnnie Day identified Taylor and Skinner as two of the individuals depicted in the "Knock It Off" video.  The video also depicted a pile of cash and a firearm that was the same make, model, and color as the one that was stolen from Lee.  The grip was two-toned, just as Lee described.  Sergeant Day testified that in the rap song, "VVS" refers to diamonds, and specifically to cut and clarity.  The sergeant explained that "459" is the Penal Code section for burglary.  "Rolly" refers to a Rolex watch. Sergeant Day interpreted the last part of the excerpted lyrics in which Taylor says " '459' " and " 'gang activity' " " 'that's how we livin' ' "as Taylor bragging about how he engages in gang activities and burglaries to make money.  Skinner's rap that he's " 'in a Chinky spot' " " 'for the band days' " meant that he was in a house owned by Asians trying to get money.  The sergeant understood Skinner's statement " 'me and HB doing plays' " to mean that he and Taylor were committing crimes together. Immediately after that, Taylor confirms by saying " 'big plays.'" The sergeant interpreted Skinner's final statement that they " 'couldn't even buy a 40 and now we strapped with K's' " to mean that they did not have money to purchase a .40 caliber firearm,

24

but that now they could buy AK's or possibly that now they had thousands of dollars. At the end of the excerpted lyrics, Taylor raps "We in your shit. We out your shit[,]" which Sergeant Day understood to refer to Taylor and his flocking crew going in and out of homes burglarizing them. Taylor talks about his gang being " 'knock-knock bandits,' " which refers to a style of burglary where the perpetrator first knocks on the door to ascertain if anyone is present in the home. The sergeant had not seen evidence of the knock-knock style of burglary in the present crimes, however.

In closing argument, the prosecutor argued that in combination with other evidence, the rap lyrics were strong circumstantial evidence that Taylor committed the crimes charged.

## 2. __Analysis__

### a. *Admission Pursuant to Section 352 and 352.2*

Pursuant to Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Under recently-enacted Evidence Code section 352.2, subdivision (a), "In any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under Section 352, shall

consider, in addition to the factors listed in Section 352, that:  (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings."

We review the trial court's rulings on relevance and the admission of evidence for abuse of discretion.  (*People v. Parker* (2022) 13 Cal.5th 1, 39.)

Taylor argues that the trial court's analysis of whether the "Knock it Off" video was admissible "started and ended with the flawed premise that the rap music video should be treated as a current and truthful communication from appellant and Skinner."  This is a mischaracterization of the trial court's analysis, which was guided by the Legislature's explicit considerations.  The trial court never expressed a belief that the video was a true account of events.  Rather, it considered, as Evidence Code section 352.2 requires, that the video was released close in time to the charged crimes, that there were many similarities between the video and the crimes alleged, and that the rap video included details that mirrored details of the crimes that were not publicly available.  The rap was performed by Taylor and former co-defendant Skinner.  Other people who were suspected of involvement in the conspiracy, the robberies, and the burglaries were also depicted.  The video was released within

26

weeks after the robbery of Kim and Lee, and included a firearm that was the same make, model, and color as the one stolen from Lee. The rap song referenced diamonds (VVS) and a Rolex watch; jewelry was stolen from the crime victims, including diamond earrings and a Rolex watch. The video referenced the homes of Asian people as targets in multiple robberies. The charged crimes were numerous and involved Asian victims, notably Kim and Lee, who were robbed only weeks earlier. The similarities were uncanny, the video was released close in time, and Taylor was one of the performers. He rapped the majority of the lyrics that implicated him personally. The probative value of the video was very high. The trial court carefully limited the lyrics to those that were highly probative of the crimes, and excluded the remainder to avoid the undue prejudice that Evidence Code sections 352 and 352.2 are designed to prevent— i.e., " ' "evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. . . ." ' [Citations.]" (*People v. Padilla* (1995) 11 Cal.4th 891, 925.) Taylor suffered only the permissible "prejudice 'that naturally flows from relevant, highly probative evidence.' " (*Ibid*.) The trial court did not abuse its discretion by admitting the "Knock it Off" video and relevant excerpts of its lyrics.[7]

[7] Although Taylor does not contend that the prosecutor committed misconduct in closing arguments (and counsel did not object to the prosecutor's arguments at trial), he accuses the prosecutor of vouching for the truth of the contents of the video and eroding the presumption of innocence. Contrary to Taylor's assertions, the prosecutor did not overplay the weight that the video carried. He presented the video as one piece of circumstantial evidence that, when viewed with all of the

Taylor's contention that admission of the rap video rendered his trial fundamentally unfair in violation of his constitutional right to due process also fails. " 'Application of the ordinary rules of evidence generally does not impermissibly infringe on a capital defendant's constitutional rights.' [Citations.]" (*People v. Ramirez* (2022) 13 Cal.5th 997, 1097.) Taylor offers no persuasive argument that this situation warrants an exception to that rule.

### b. *Racial Justice Act*

At trial, defense counsel did not object to admission of the "Knock It Off" video on the ground that admission would violate the Racial Justice Act. Taylor recognizes that this failure would normally result in forfeiture of the issue on appeal.[8] To avoid

_____

evidence presented at trial, tended to show Taylor's guilt. The prosecutor argued: "Now, this is a rap video; right? This alone doesn't prove that Mr. Taylor did anything other than make this video. But again, you take a look at this. You listen to his own words and you look at that in conjunction with everything, and it paints a picture." The prosecutor stressed that the rap video was released within weeks of the robbery of Kim and Lee; was performed by Taylor and Skinner, who allegedly committed the crimes together; depicted a firearm that was the same make, model, and color of the one stolen from Lee; and there were numerous similarities in the details of the crimes described in the rap lyrics and the crimes alleged. These are the exact factors that the Legislature requires to be present for rap lyrics to be admitted.

[8] Every Court of Appeal to address the issue agrees that a Racial Justice Act claim is forfeited on appeal if not first raised in

28

forfeiture, he claims that his counsel's failure to object constituted ineffective assistance. "When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Here, as we will discuss, admission of the "Knock it Off" video did not violate the Racial Justice Act. In the absence of a violation, there can be no prejudice, and counsel's performance cannot be adjudged deficient based on his failure to object.

The Racial Justice Act provides, in relevant part, "The state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin. A violation is established if the defendant proves, by a preponderance of evidence . . . [¶] (1) . . . an attorney in the case [or] a law enforcement officer involved in the case . . . exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin. [¶] (2) During the defendant's trial, in court and during the proceedings, . . . an attorney in the

_____

the trial court. (See *People v. Lashon* (2024) 98 Cal.App.5th 804, 810–817; *People v. Singh* (2024) 103 Cal.App.5th 76, 112–116; *People v. Quintero* (2024) 107 Cal.App.5th 1060, 1077; *People v. Corbi* (2024) 106 Cal.App.5th 25, 41; *People v. Wagstaff* (2025) 111 Cal.App.5th 1207, 1219–1222; *People v. Midell* (2025) 113 Cal.App.5th 1060, 1072; *People v. Hernandez* (2025) 115 Cal.App.5th 256.)

case [or] a law enforcement officer involved in the case . . . used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful. This paragraph does not apply if the person speaking is relating language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect." (§ 745, subd. (a)(1)–(2).) "The statute defines the phrase ' "[r]acially discriminatory language" as "language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin. Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory.' (*Id*., subd. (h)(4).)" (*Singh, supra,* (2024) 103 Cal.App.5th at pp. 109–110.) The defendant bears "the burden of proving a violation of subdivision (a) by a preponderance of the evidence. The defendant does not need to prove intentional discrimination." (§ 745, subd. (c)(2).)

As we discussed above, the "Knock it Off" video was highly probative of guilt in this case, and met the exceptions that permit admission pursuant to Evidence Code section 352.2. The prosecutor did not make racially discriminatory remarks at trial. The racial epithets were uttered by Taylor and former co-defendant Skinner in the video. When explaining the meaning of

slang used in the rap lyrics to the jury, Sergeant Day quoted three lines of lyrics containing the racial epithet that Taylor and Skinner used. It was permissible for the sergeant to quote the language Taylor and Skinner used in the rap video. Section 745, subdivision (a)(2) provides that the statute does not apply where an officer involved in the case "is relating language used by another that is relevant to the case." The Racial Justice Act was not implicated.

## C.    *Sentencing Issues*

Taylor also contends that the trial court erred by imposing multiple punishments for the same act in several counts, and asserts that there are errors in the abstract of judgment. We decline to address those issues here, as the trial court will have the opportunity to revisit its sentencing decisions at the resentencing hearing, and Taylor may raise any objections with the trial court at that time.

# DISPOSITION

Taylor's convictions for kidnapping to commit robbery in counts 11 and 12 are reversed, and the judgment is modified to reflect that the convictions in counts 11 and 12 are reduced to the lesser included offense of felony false imprisonment by violence or menace.  The cause is remanded for a full resentencing.  In all other respects, the trial court's judgment is affirmed.

NOT TO BE PUBLISHED.


MOOR, J.


I CONCUR:


KUMAR, J.*

---

\*    Retired Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

The People v. Justin Taylor
B327033


BAKER, Acting P. J., Concurring



I join the majority's discussion and resolution of defendant
and appellant Justin Taylor's (defendant's) challenges to his
aggravated kidnapping convictions.  But I believe it is
unnecessary to decide whether there was error under Evidence
Code sections 352 and 352.2 (assuming that section applies
retroactively), and whether counsel was constitutionally
ineffective for not objecting on Racial Justice Act grounds, in
connection with admission of the rap video excerpt in evidence.
That is because the other evidence against defendant was so
strong as to leave me convinced any deficient performance by
counsel or evidentiary error was not prejudicial.



                    BAKER, Acting P. J.